In the Matter of the INQUIRY CONCERNING William R. EADS, Judge of the Iowa District Court.

No. 84–1099.

Supreme Court of Iowa.

Feb. 13, 1985.

Thomas J. Miller, Atty. Gen., and Richard A. Williams, Asst. Atty. Gen., for applicant.

John A. McClintock and David L. Brown of Hansen, McClintock & Riley, Des Moines, and John M. Maher of Maher & Forte, P.C., Cedar Rapids, for respondent.

UHLENHOPP, Justice.

This proceeding involves charges of violations of canons of judicial ethics by a district judge. See Iowa Const. art. V, § 19; Iowa Code §§ 605.26–.32 (1983); *In re Matter of Harned*, 357 N.W.2d 300 (Iowa 1984); *In the Matter of Carstensen*, 316 N.W.2d 889 (Iowa 1982). We examine the record de novo as in an equity appeal. *Carstensen*, at 891.

The determinative issues are largely factual, requiring us to relate the testimony quite extensively. The testimony discloses facts which are remarkably undisputed. We begin with the testimony which establishes beyond question that respondent William R. Eads, a judicial veteran of more than twenty years and chief judge of his district, is undeniably a jurist of integrity and competence. This was proven by testimony of judges who had personally served with him over extended periods of time and attorneys who had practiced before him. In 1982, however, an incident occurred

which set off a chain of events involving conduct by Judge Eads which was, as witnesses stated, entirely out of character for him.

Two principals are involved: Judge Eads and a young attorney, Robert M. Jilek, who is associated with the Cedar Rapids law firm of Simmons, Perrine, Albright & Ellwood. Mr. Jilek engaged in trial work from the start as a vigorous advocate, and impressed respondent with his ability. The two struck up a friendship, had coffee together, and visited with each other at the YMCA where they both took physical exercise. They had a quite close relationship.

The first incident involving disharmony between these two individuals appears to have occurred in connection with the trial of *Kester v. Bruns* reported on appeal at 326 N.W.2d 279 (Iowa 1982). In his opening statement in that trial Jilek went beyond the testimony he could produce, opposing counsel moved for a mistrial, and Judge Eads overrruled the motion and held on subsequent motion for new trial that the statements were improper but did not affect the result the jury reached. We affirmed although we characterized the statements as at least reckless. In the present proceeding respondent described that occurrence as the first time he had some disenchantment with Mr. Jilek, "and it was appealed following the normal procedures, so I called him and told that he shouldn't have done that and what is done is done."

A marriage dissolution case handled by Jilek actually precipitated the breakdown of relations. We will refer to the married couple in that case by the fictitious names of George and Mary Brown, as their actual identity is of no moment in our present decision. George also was a young attorney, and house counsel for a corporation. Judge Eads had a quite close relationship with George similar to the one he had with Jilek; he had coffee with George, visited with him on various subjects, conversed with him at the YMCA, and belonged with him to a men's monthly dinner club.

The Browns had a stormy marriage. Mary was just finishing a nursing course and had been promised a job as a nurse. She claimed that George so harassed her mentally and physically and made her life so hectic that she could not go on with her training and employment. In particular she feared he would physically abuse her and would remove items from the home that she needed in order to keep house for herself and the parties' child.

In March 1982 Mary, accompanied by her mother, saw one of the Simmons Perrine partners about a marriage dissolution. The partner referred them to Jilek. Mary described the home situation to Jilek and told him of incidents of physical violence by George, including "serious fighting, minor injury to [Mary], threats and what she considered veiled threats against her, throwing across the kitchen of [Mary] by [George], throwing of [Mary] against a sink injuring her back, and forceful pushing and restraint of [Mary] by [George]." Mary made a number of other serious charges which we find no necessity to repeat.

Jilek commenced a dissolution action for Mary and sought a temporary injunction prohibiting George from committing physical violence and from removing personal property from the home. The application for injunction sketchily outlined the violence and Mary's fear for herself and fear of removal of the property. Jilek obtained the injunction in ordinary course from another judge.

George claimed that Mary's charges were untrue, and we of course do not decide where the truth lies in that dispute. George had previously conversed with Judge Eads about the marital problems, and Judge Eads had suggested Jilek as an attorney for George. When Jilek instituted the dissolution suit George called Judge Eads and told him about it. Later George showed Judge Eads the dissolution papers. Judge Eads testified:

Q. Where did you first see them? A. I think it may have been in his office. I just swung by for coffee or something.

Mr. Story [commissioner]: Whose office?

Judge Eads: Mr. [Brown's].

Q. Now, when you saw those papers in his office, did you talk about them? A. I just told him that an injunction could be very harmful to your reputation, implying you are a wife-beater.

Shortly after that occurrence Judge Eads saw Jilek. He stated that Jilek had an injunction against Brown and contended Jilek had not adequately investigated the case and should have talked with Brown. He asked Jilek how he would like to have an injunction against himself. Jilek responded he hoped he would not deserve it, and Judge Eads said, well, of course, he did not know the whole thing.

About a week later Judge Eads called Jilek to his chambers. Jilek's version of that occurrence was this:

A. Well, I'm not sure how much conversation in the sense of discourse, but Judge Eads said sit down, or I sat down in one of his chairs and he was red-faced as I mentioned, and shaking, and he said that he had seen the [Brown] file or papers; that he thought I was a "class guy" was the term I remember him using, and that he had read over the papers; that there had been a shoddy investigation; that there wasn't a need for the injunction; that [George] wouldn't do such things.

He called [George] his friend, good friend on at least three different occasions at that time; said that I was doing it solely because of fees, talked about the fact that this would hurt [George's] job or affect his job and that lawyers and Judges have a capacity to hurt people; that the matter of the injunction was not looked into properly in connection with [George], hurting [George's] job.

He said there is an unwritten Code among lawyers that they don't take cases or do such things to lawyers, local lawyers; that this matter of an injunction wasn't needed; that I hadn't investigated it properly to find out if one was really needed; that [George] wasn't that type of guy, and then dismissed me saying that he had calls to return and to leave the door open when I left.

Q. Now, Mr. Jilek, during the course of this entire conversation with the Judge, you indicated that he was shaking and red-faced when you first came in. How was his demeanor throughout the conversation? A. Well, he was very much raised over his desk at me and it wasn't just a conversation, as you put it.

Judge Eads testified:

Q. Why did you call him to your chambers that afternoon? A. I just wanted to express high displeasure at the injunction which I felt at that point was unjustified. The temporary injunction, not the divorce itself.

Q. Now, during that conversation, why don't you relate that conversation to the Commission the best that you can? A. Well, Mr. Jilek came in and he smiled, you know, and sat down, and I can't really recall that much detail, I do remember saying I always thought of you as a class lawyer, which I did, and getting this—I can't remember the exact words—but getting this injunction, I forget now, but it was clear displeasure on my part.

Q. Would you have told him that you had seen the file? A. I may have, yes. I could have, the file. I don't know if it's carbon copies that he had given him or Xeroxed copies.

Q. Did you tell him anything at all about him being the one who suggested or pushed for the injunction? A. Yes.

Q. Why did you tell him that? A. Well, I believe Mr. [Brown] indicated—if I recall, I said, "The indication, is that your idea," and he denied that it was his idea.

Q. Where did you get the idea it was Jilek's idea to get the injunction? A. I think just from the conversation—well, yes, I believe from the conversation. It's been so long ago, but it was the conversation with Mr. [Brown]. Some other reason, I can't recall why I thought it was his idea instead of herself.

Mr. Story: It might be indicated on the injunction.

The Witness: There was something else that indicated it was the attorney's, not the wife's idea.

Q. During this conversation, did you ever talk to him about lawyers being somebody special in litigation? A. I don't mean special in the sense they are better than anyone. Just the fact that they can be provincially injured more, they are right within the Court system.

I don't recall the words. I guess I'm one of the old school. It's changed, that one local lawyer doesn't sue another local lawyer. They are certainly entitled to legal representation. That has now changed, I can see. I'm not going to say I wasn't in error in that.

Q. So it was your feeling at that time that one local lawyer should not be suing another one? A. Yes, sir, whether that's a justified position or not.

Q. Do you recall—A. It causes dissension in the Bar, people that are at the same social events. But as for something a lawyer is something special, I have ruled against lawyers in cases involved against lawyers, and they did not come out favorable at all. In fact, the Horstman case is an example where wives can get money for legal work that they help provide.

Q. Do you recall telling him that the investigation had been shoddy in connection with—A. I could have said that, yes.

Q. Do you recall telling him that there wasn't a need for the injunction? A. I could well have said that.

Q. How would you know that? A. I had taken Mr. [Brown's] contention at this point that he did none of these things and in absence of what appeared to be any investigation and knowledge that Mrs. [Brown] had some emotional difficulties.

Q. Why would you take Mr. [Brown's] words for those things? A. Because I knew him.

That evening Jilek contacted Mrs. Brown, told her of the occurrence in Judge Eads' chambers, and secured her permission to reveal to Judge Eads more of the evidence of Mr. Brown's violence and other misconduct. Jilek then wrote a long letter to Judge Eads disclosing some of that evidence and delivered it to Judge Eads in an envelope marked confidential. Judge Eads testified:

Q. After receiving that letter, why wasn't this matter put out of your mind as being any problem on the part of Mr. Jilek? A. I showed it to Mr. [Brown] and he denied the allegation.

Q. I ask the question again, why, after receiving this letter, why weren't your concerns about Mr. Jilek's ethical conduct put aside? A. They weren't put aside because I showed Mr. [Brown] the letter and he not only denied it, but claimed she in fact initiated the physical assault.

From that time forward Judge Eads estranged himself from Jilek and, according to Judge Eads' testimony, "was unfriendly." He made occasional inappropriate remarks to Jilek of which the following are illustrative.

The two individuals would occasionally be at the YMCA at the same time. Judge Eads testified:

Q. On one of these occasions, did you have some conversation with him about the [Brown] matter? A. I said in a moment of anger, and I'm not proud of it, I said I suppose this will be good for a two or three thousand dollar fee.

Q. Why were you angry? A. It all stemmed back again from the injunction. I felt sort of a haughtiness, but I should not have said that.

Q. As a matter of fact, during the conversation did you tell him he was doing that solely for money for himself? A. I don't recall. I could have put that blandly.

Q. How do you recall you put it? A. I thought it was two or three thousand, as a sarcastic remark. I'm going to be candid, it was a sarcastic remark.

Judge Eads testified regarding another occasion at the YMCA:

Q. Why don't you tell the Commission what Martindale-Hubbell is? A. It's a rating service of lawyers that rates both their legal ability and their efforts. Judges are asked to fill it out.

Q. Judges as well as other lawyers, is that right? A. Yes, sir.

Q. And based upon the reports that they receive, they publish a list of lawyers which is published nationwide and available to persons throughout the country rating various lawyers? A. Yes, sir.

Q. What was your comment that you made to Mr. Jilek concerning Martindale-Hubbell? A. I said, you know, Judges rate lawyers. I had good intentions or I still, I know he didn't think so, but I was hoping Mr. Jilek would modify his views on injunctions, matters of that type. I said they give ratings and I meant it hopefully that it might make him feel that he should re-examine the way he was doing things. I, in fact, never did send in anything.

The problem between Judge Eads and Jilek then began to spread to other members of the Simmons Perrine firm. Judge Eads told Jilek he was going to report Jilek's conduct to the firm. Subsequently Judge Eads approached John R. Carpenter, a senior partner, about Jilek. Carpenter testified Judge Eads said, "Has your partner Jilek told you about his unethical practice or actions?" Judge Eads testified he believes he said, "Did Bob Jilek tell you about the problem we are having?"

On another occasion Judge Eads and Carpenter talked at the YMCA. Carpenter testified:

Q. What did he tell you at that time? A. To the best of my recollection, he said, "Don't think that my inaction means that the unethical actions of Jilek are forgotten. They are not going to blow away. And if he thinks this is so, he is mistaken."

Q. Was there any further conversation at that time? A. I responded. I think I said, "Bill, you are wrong about this; I hate to see two people that I respect involved in such a way," some-

thing of that nature. That was the end of that conversation.

Q. Do you recall any further comment by the Judge, any other comment by him at that time? A. Nothing further was said. I finished my shower. He was showering, and I walked out of the shower and as I passed him, I believe I said something to the effect that it wasn't Bob, meaning Jilek, that was dropping this, it was me, and he then said, "People who wear three-piece suits can be kooks, too, you know," and I—

Mr. Newport: I couldn't understand that.

The Witness: "People who wear three-piece suits can be kooks, too."

Mr. Story: Now, who said this?

The Witness: Judge Eads.

Mr. Story: About who?

The Witness: I presume it was Bob Jilek, because that was the only one we were talking about.

On a similar occasion Judge Eads asked a senior partner of the firm, in a public eating place, if he was aware of Jilek's doing unethical things. Judge Eads testified that he did not recall saying "unethical" and that he made the statement very low and in an unobtrusive manner.

Because of the disharmony, Jilek sometimes sent other young attorneys to appear in his cases before Judge Eads. On one occasion he sent an associate on a default dissolution. When Judge Eads learned that the case belonged to Jilek he told the associate he would not prove up on any more of Jilek's cases unless Jilek was there. In the present proceeding Judge Eads testified, "I should not have said that." A similar incident occurred causing Judge Eads to become angry when Jilek sent an associate, instead of personally appearing, to get a person released from jail.

In one instance Jilek appeared for a temporary support hearing in a dissolution case. The opposing attorney, Maurice L. Nathanson, did not get notice of the hearing and did not appear. Jilek testified:

I very cautiously walked into Judge Eads', knocked upon the door and told him that Maury hadn't gotten word on the case and we would like to postpone it, and he told me that he looked at the file, that I was seeking five hundred dollars rather than two-fifty from the Court in temporary attorney's fees which was out of line from what other people were doing, and that an application for waiver of conciliation had been filed and that was unnecessary and that I basically shouldn't have filed the document, and this was Mark Liabo who had actually filed it and used my name and initialled it.

And then I went down to Jane McSweeney, the Court Administrator, to get it postponed to the next week and Jane said she had received [it]—

. . .

Jane said that—I asked it to be rescheduled for the next week. These are usually handled on affidavits anyway, and she said that Judge Eads had called down and had asked that this case be assigned to him, and he was going to be out of town the next week and so we couldn't have it until sometime two or three weeks later.

Judge Eads testified:

Q. I can't name the case, but it involved Mr. Jilek and I think Attorney Nathanson—A. Yes, sir.

Q. —when there was a hearing scheduled on some temporary support matter and Mr. Nathanson apparently didn't get the Notice and didn't appear—A. Yes, sir.

Q. —and it was understood it would be continued, and did you in fact call the Court administrator's office and indicate that you wanted that set before you when it was rescheduled? A. Yes, sir, I did, and I should not have.

The members of the Simmons Perrine firm discussed the Eads-Jilek problem. Thereafter two senior partners met with Judge Eads at his chambers to discuss his concerns about Jilek. At the meeting Judge Eads questioned the propriety of Jilek's obtaining an injunction against a local attorney; of Jilek's fees in domestic relations cases; of running a "divorce mill"; and of Jilek's actions in trials (the Kester-Bruns case?).

We have already considered the Brown injunction and the Kester-Bruns case. Judge Eads' question about fees apparently stemmed from Jilek's asking for $500 temporary fees instead of the customary $250 to $300; Judge Eads testified he knew the amount allowed would be fixed by the court, not by the application. He also testified he should not have made the charge about a divorce mill.

At this point in the series of events, the law firm had several meetings of its members to discuss Judge Eads' complaints, and asked Jilek to explain the Brown matter and the trial in question (probably Kester v. Bruns). The firm ultimately concluded that no justifiable basis existed for the Judge's complaints. Senior members of the firm drafted a letter to Judge Eads to that effect and also stated that Jilek would ask the Judge to recuse himself in Jilek's cases. Judge Eads said he felt the letter did not explain anything.

Then began several requests by members of Simmons Perrine for recusals by Judge Eads in their cases, and the involvement in the controversy of the firm's senior trial attorney, Robert C. Tilden. The firm felt obligated to tell its clients who were going before Judge Eads of the Eads-Jilek friction.

At this juncture Jilek had a preliminary proceeding in a dissolution case which involved considerable judicial discretion. The proceeding came before Judge Eads. Tilden accompanied Jilek to Judge Eads' chambers, explained the situation to the Judge, and implored him to recuse himself. At one point the Judge stated to Jilek, "Can't you speak for yourself?", and told him he would not hold him in contempt for doing so. The Judge refused to recuse himself informally, but agreed to do so on formal application. Such an application was made and sustained, Judge Eads stating to Tilden, "Well, you won *this* one."

In another dissolution case Jilek asked Judge Eads to recuse himself, he refused, the client obtained other counsel, and Simmons Perrine refunded the retainer.

By this time the relation between Judge Eads and Tilden was very strained. In addition, the Judge apparently was not speaking to Carpenter and another senior partner. Tilden had a large lawsuit involving as a defendant a retainer client, Amana Refrigeration. The case was set for trial before Judge Eads. Tilden had to decide whether or not to ask Judge Eads to recuse himself. He disclosed to Amana the problem as to Judge Eads. He was fearful that if he lost the case, Amana might attribute the loss to his deteriorated relationship with Judge Eads, and the firm might lose the client. He decided to move for recusal, and did so.

Judge Eads interpreted the motion as an affront to his integrity. He overruled the motion without reading the affidavit stating the grounds. Subsequently he disclosed to all counsel that he was guarantor of a note to a bank which was another defendant in the case, and recused himself on that ground.

A final incident which we will relate involved Jilek and Benjamin Blackstock, whom Judge Eads described as a "lawyer and a friend of mine." Jilek had defended a lawsuit for personal injuries which Blackstock had brought for himself against an institution. Judge Eads testified for Blackstock; he was not a character witness, but he had no independent recollection of the facts at the time. Jilek's client won and the court costs were assessed against Blackstock. Jilek endeavored to collect those costs by letters to Blackstock, but a disagreement existed between the two as to Blackstock's liability for a part of them relating to depositions. On a number of occasions Judge Eads talked to Jilek about not trying to collect the costs; the last occasion was at the YMCA. Jilek testified Judge Eads said, "Feeling a little empty not having any local attorney to harass, he said, trying to collect court costs from Ben Blackstock?"

This overview does not include all incidents but gives the picture of the relationship between Judge Eads on one side and Jilek and some other members of the Simmons Perrine firm on the other. The Judge was confronted with having a leading firm at odds with him and requesting recusals. He regarded this as an affront to his integrity. He also felt that Jilek "had a certain appearance of arrogance." The law firm members had the problem of having a judge at odds with them. Tilden testified:

We investigated as impartially as we possibly could the accusations that had been made against our—one of our partners. I suppose that's been gone into and we, I think most importantly, we were confronted with a spector of not only Amana Refrigeration, but in the future presumably other big clients, insurance companies having to be told that we have such an ongoing adversarial relationship with the Chief Judge of the District, we feel compelled to tell you about that, and you make your decision as to whether or not you want us to represent you in this case because the Chief Judge has the opportunity to assign to himself whatever case he wants.

And so I, as the trial attorney, was faced with the possibility that I would have to at any given time seek to withdraw from a case where I might have had untold number of hours in preparation that would have to be either written off or refunded, as the case might be, because it would have to be handled by somebody else and we would ultimately lose the clients possibly.

Also:

To me, the importance is the relationship that it placed us with our good clients. That was a major concern to me and I didn't know how and I still don't to this day know how it's going to be resolved.

Judge Eads testified:

Q. Now, as relates to the matters that you discussed, you said that rightfully or wrongfully, you started taking

these applications for recusal as a personal affront? A. Yes, against my integrity.

Q. It was your feeling that the lawyers were saying to you they felt your integrity was such that you could not be trusted to be fair in handling the cases? A. That I would take it out on the clients.

Q. Now, under any circumstances would such a situation have occurred where you would have let your personal opinions reflect on a client's case? A. No, sir.

Q. As relates to this scenario, can you give the Commission some overview as to the manner in which you did react to all this, in the present perspective on it, in this situation? A. My present perspective is that I overreacted. I should have swallowed my pride and recused myself earlier. Now, this is hindsight.... As I said, it was a fact that I thought if all you had to do was make a Motion to Recuse and then say you withdraw, I would be constantly recusing.

However, in hindsight, my relations with Mr. Jilek had got so poor that I should have recused myself. I did something a Judge should never do: I lost my temper. I can't undo it. I have—excuse me.

Q. What is your position, Judge, on the future as to your relationship with Mr. Jilek? A. I hope to reestablish it. Listening to him today, it brought back today how we enjoyed it, I enjoyed Mr. Carpenter, and Mr. Tilden and I were never that close. If I could add one thing here—well, there is that old adage, every dog is entitled to one bite. Whether he is entitled to it or not, I would hope that twenty-one years of judging with no serious complaints, at least, might be weighed by the Commission. I'm not proud of some of the things I did, the lack of good temper and not calling Mr. Jilek to sit down and talk.

Q. What assurances, if any, do you make to the Commission as to being overcome by subjective judgment in the future? A. In this particular situation?

Q. Anytime, sir? A. It never happened on any other case. I think I should just indefinitely recuse myself in matters. I mean, I could be even leaning over backwards in their favor unconsciously.

Returning to the Brown case, at Jilek's suggestion Mary Brown consulted another attorney. She ultimately settled the custody and property aspects of her case and obtained a dissolution before another judge. She was dissatisfied with the settlement and attributed the result to Judge Eads' input. She ultimately filed a complaint against Judge Eads before the Judicial Qualifications Commission. This was without instigation by Jilek, although he obtained the form for her to use.

In June 1984 the commission held a hearing on the complaint and found that Judge Eads violated canons 1, 2, and 3 of the canons of judicial ethics. A majority of the commission recommended discipline of a reprimand, removal as chief judge, and suspension without pay for three months without loss of fringe benefits. The commission then brought the proceeding before this court in accordance with law.

In this court two problems must be resolved: whether Judge Eads violated the canons of judicial ethics and, if so, the appropriate discipline we should impose.

I. This is not a lawsuit between Judge Eads and Jilek in which we must decide whether one of them was right and the other wrong. It is an inquiry into the conduct of a judge to determine whether the conduct conflicted with the canons of ethics.

■ Judge Eads' conduct violated the high principles in the cited canons. Indeed, for the most part the judge acknowledged the impropriety of his conduct, saying in substance, "I was angry, I'm human, I shouldn't have done it."

The record demonstrates that the Judge had no business injecting himself into the Brown matrimonial litigation or maintaining subsequent hostility to the law firm

which had been involved in that litigation. We hold that the charges against him are established.

■ II. The difficult part of the proceeding relates to an appropriate disposition. We have in mind the commission's recommendations as to discipline. The commission is a constitutional body, Iowa Const. art. V, § 19, composed of a district judge, two attorneys, and four electors who are not attorneys. Iowa Code § 605.26 (1983). The commission was unanimous in its recommendations in this case. We give respectful consideration to those recommendations, although we are not bound by them. *In re Matter of Harned*, 357 N.W.2d 300 (Iowa 1984); *cf. Committee on Professional Ethics and Conduct v. Wollenzien*, 342 N.W.2d 490, 491 (Iowa 1984) (recommendations of grievance commission: "we give respectful consideration to the commission's findings and recommendations though they are not binding on us").

On the one hand, Judge Eads had a long and honorable career as a judge and chief judge prior to these events. His present infractions do not involve dishonesty or moral turpitude. He was open and candid throughout the present proceeding.

On the other hand, Judge Eads' misconduct was not merely an isolated incident. For a period of approximately two years he carried on a campaign of intimidation against Jilek. This started when the Judge improperly involved himself in the merits of a friend's dissolution case and became legal adviser and advocate for the friend. It continued when Jilek did not succumb to the Judge's efforts on behalf of Brown. The campaign expanded to other members of Jilek's law firm when they supported Jilek.

Canon 1 of the canons of judicial ethics requires judges to uphold the integrity and independence of the judiciary: "A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved." Canon 2 re-

quires a judge to avoid impropriety and the appearance of impropriety in all activities. A judge must act "at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Canon 2(A). Moreover, of critical significance in this case, "A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others...." Canon 2(B). Canon 3(A)(3) enjoins a judge to be "patient, dignified, and courteous" to everyone including lawyers with whom the judge deals in an official capacity.

Even though the commission's findings are merely advisory, they constitute an accurate and helpful characterization of the evidence:

> There can be little doubt, and [Judge Eads] so conceded at the hearing, that he had indeed violated the canons. While there were violations of all of these canons, there were in particular violations of [canon 2(B)] in that he continuously interjected himself into the [Brown] dissolution matter. He was not only wrong in his actions concerning the case, but also in his perception of the case. In particular, the judge seemed to feel that a member of the Bar [Mr. Brown] was entitled to some different treatment than any other party to a dissolution matter. Because of his attitude concerning [Mr. Brown] and his case, the judge's conduct toward Mr. Jilek and members of his firm was reprehensible.... His course of conduct substantially caused injury to the firm and its clients and may have affected the outcome of litigation. It certainly adversely affected the client's perceptions of the impartiality and fairness of the judiciary.

The commission added:

> This commission is concerned about how an individual of such high caliber could suddenly conduct himself with regard to one attorney and his firm in such an irrational manner, and to allow such a matter to continue to fester for over two

years, stopping only when the threat of action by this Commission appeared imminent. . . .

■ This court has been firm in its insistence that members of the Iowa bar adhere to the Iowa Code of Professional Responsibility for Lawyers. We can be no less firm in our insistence that judges adhere to the Iowa Code of Judicial Conduct. We have emphasized that lawyers have a public responsibility because they are officers of the court. We must also emphasize that judges have a special public responsibility as judicial officers. We have done so in the context of a criminal law violation by a judge. *See State v. Morrison,* 323 N.W.2d 254, 256 (Iowa 1982) ("The offense was more serious because defendant was a judge than it would otherwise have been."). Now we must stress the public accountability of judges for disciplinary infractions.

■ The canons of conduct recognize that public confidence in the judiciary is eroded by irresponsible or improper judicial conduct. In certain areas judges accept restrictions on their conduct "that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly." Canon 2, Commentary. Judges must be particularly sensitive about their social relationships with lawyers. Although judges are not required to terminate friendships with lawyers, they must regulate their relationships to avoid even the appearance of impropriety. *See* ABA Standards, *The Administration of Criminal Justice,* at 168 (1974). Prudence dictates that judges be especially sensitive about their associations with attorneys who are likely to appear before them in the courtroom. *Id.*

With due respect to the many outstanding qualities of Judge Eads, the fact cannot be denied under the present record that he improperly instituted and then carried on an inexcusable campaign against a lawyer. In doing so, he was guilty of serious and substantial breaches of fundamental canons of judicial conduct.

■ As with attorney discipline, we must consider more than the judge's indi-

vidual circumstances. The overriding purpose of the judicial disciplinary system is to provide a means for maintaining the integrity of the judicial branch of government. *In the Matter of Carstensen,* 316 N.W.2d 889, 891–92 (Iowa 1982). The public must be protected, others must be deterred from similar misconduct, and confidence in the judiciary must be vindicated.

Specifically as to the discipline, in this particular case we believe that the matter of Judge Eads' chief judgeship should not be a part of the decision and should be left to the regular biennial appointment process in light of the circumstances at that time. *See* Iowa R.Civ.P. 376.

As to the other parts of the commission's recommendations, upon consideration of the circumstances disclosed by the record we reprimand Judge Eads for his improper conduct, and we suspend him from judicial and administrative duties for a period of sixty days commencing March 1, 1985, without compensation except fringe benefits.

APPLICATION GRANTED, DISCIPLINE IMPOSED.

All Justices concur except HARRIS and LARSON, JJ., who dissent in part, and McGIVERIN, SCHULTZ, and CARTER, JJ., who take no part.

HARRIS, Justice (dissenting in part).

Notwithstanding the serious breaches of conduct detailed in the majority opinion, I cannot agree with the sanctions imposed. Under any view of the facts Judge Eads' conduct must be, as he freely concedes, condemned. But under the circumstances a reprimand would be sufficient and appropriate.

I have but slight disagreement with the majority's factual summary. First, I do not think the record establishes that, during the period involved, Judge Eads used his office of chief judge to assign specific cases to himself. Trial assignments are not usually superintended by a chief judge. More often this detail is assigned to the court administrator or an assistant of that

office. In some districts it is the province of the presiding judge. If the majority is suggesting that Judge Eads was bent on getting Simmons firm cases assigned to himself, I disagree.

The majority makes special mention of an incident when Judge Eads demonstrated a special interest in retaining the supervision of a matter that was to be tried to him. But this is not an unusual practice. As a matter of efficient court administration it is to be encouraged. When a judge becomes familiar with a case it is sometimes a policy—sometimes indeed the rule—that the same judge see it through to disposition. This makes it unnecessary for another judge to duplicate the efforts of the first in becoming acquainted with the dispute.

Perhaps the record was not made complete on these matters because, during the proceedings, there was in effect a change in the nature of the complaint. The complaint was filed by a layperson whom the majority identifies as Mary Brown. She did not even testify in the proceedings. If Mary Brown's complaint had related to these matters perhaps a better record would have been made on assignment practices in the district.

One thing is crystal clear in the record. The Simmons firm sought recusal only on certain selected cases. Several members of the firm continued to argue motions and try cases before Judge Eads with no problems. Recusal is not available on selective demand of a law firm. These facts present a poor basis for making a refusal to recuse a ground for disciplining a judge.

None of the foregoing factual differences reach, or even approach, the point of justifying Judge Eads' conduct in injecting himself in the private litigation of his friend. Although his conduct towards Jilek was wrong, other facts mentioned by the majority should weigh more heavily in the outcome.

Judge Eads is an outstanding trial judge. He has an enviable reputation for impeccable honesty and dedication to his calling. He has given more than twenty years of distinguished public service. The bizarre conduct here, no matter how wrong, is aberrant, wholly at odds with his record and reputation. While we of course are not awed by judicial rank in the imposition of appropriately severe sanctions, neither should we fear, when justice demands it to temper an inappropriate sanction. It seems to me that justice does demand a more moderate sanction for this one bad episode in an otherwise distinguished career. I agree with the reprimand but not the suspension.

LARSON, J., joins this dissent.