# IN THE SUPREME COURT OF IOWA

No. 14–1596

Filed February 20, 2015

Amended February 26, 2015

**IN THE MATTER OF
DOUGLAS A. KRULL,**

Judicial Magistrate.

---

On application of the Iowa Commission on Judicial Qualifications.

Commission on judicial qualifications filed an application to discipline a judicial officer. **APPLICATION GRANTED; JUDICIAL OFFICER REPRIMANDED.**

Thomas J. Miller, Attorney General, Kevin Cmelik and Grant K. Dugdale, Assistant Attorneys General, for complainant.

Mark McCormick of Belin McCormick, P.C., Des Moines, for respondent.

**WATERMAN, Justice.**

"Déjà vu all over again."[1]  We expect lawyers and judges to learn from their mistakes.  When a judicial officer repeats violations of the same ethical rules, sanctions can escalate.  In this case, the Iowa Commission on Judicial Qualifications (the Commission) recommends we publicly reprimand Magistrate Douglas A. Krull for signing a warrant to search the home of his client.  Krull in his private practice represented the mother in a pending action against her ex-husband to modify the child-custody provisions of their dissolution decree.  A police officer sought the search warrant in a burglary investigation targeting their son.  Magistrate Krull saw this matter as different from a search warrant he signed six years earlier that led to the reversal of a criminal conviction because he contemporaneously represented a client bringing a custody action against the subject of the search.  *State v. Fremont*, 749 N.W.2d 234, 235, 243–44 (Iowa 2008) (holding Magistrate Krull's conflict of interest invalidated warrant).  The Commission issued Magistrate Krull a private admonishment for the *Fremont* transgression.  This time, the district court judge in the modification action granted the opposing party's motion to disqualify Krull, requiring a continuance and new counsel for Krull's client.

On our de novo review, we agree with the Commission's finding that Magistrate Krull violated three disciplinary rules governing part-time judicial magistrates by signing the search warrant.  Because this is the second time he has signed a warrant to search the home of a party in a civil case he was handling in his private practice—conduct for which he

---

[1]David J. Dreyer, *Déjà Vu All Over Again:* Turner v. Rogers *and the Civil Right to Counsel*, 61 Drake L. Rev. 639, 640 (2013) (attributing the quote to Yogi Berra and calling him "famous for his enigmatic and oftentimes humorous remarks").

was previously admonished—we impose the recommended sanction of a public reprimand.

## I. Background Facts and Proceedings.

Magistrate Krull, age fifty-four, is a part-time judicial magistrate in the Second Judicial District. He has practiced law in Worth County since 1985. Krull served as Worth County Attorney from 1986 to 1998 before opening his own general private practice in Northwood, Iowa. He was appointed magistrate in 2005. Krull has maintained his general private practice in Northwood while serving as magistrate. Worth County has a population of 7500. According to Magistrate Krull, only three lawyers regularly practice in Worth County. He is the only resident judicial officer.

Krull agreed to represent Mindy Miller in his private practice. On March 21, 2012, Krull filed a petition against her former husband, Thomas Arndt, to modify their dissolution decree. Under that decree, Miller and Arndt shared physical care of their children, L.A. and T.A., but the children actually lived exclusively with Miller. The petition for modification asked the court to grant Miller exclusive physical care. A trial-setting conference was held on June 1, during which the court set a trial date of September 14.

On June 23, a Northwood police officer approached Magistrate Krull seeking a search warrant to investigate three gas station burglaries. The warrant identified T.A., age sixteen, as a suspect and authorized the search of Mindy Miller's residence for specific stolen goods and items used in the burglaries. The officer had identified T.A. and another young man as the burglars from a security camera video and had information that L.A. sent out a text message offering cigarettes for sale matching the brands of the stolen cartons of cigarettes. Magistrate Krull immediately

recognized the names and knew that the residence to be searched was Miller's home. He thought that his client may be upset with him for signing a warrant to search her house for evidence implicating her son, and he "recognized [she] might no longer want [him] to represent her." Nonetheless, Magistrate Krull signed the search warrant. He later explained he focused on T.A.'s behavior and did not think about how the discovery of stolen cigarettes at Miller's home might affect the modification proceeding.

At the time he signed the warrant, Magistrate Krull considered whether this case was similar to *Fremont*. In *Fremont*, Magistrate Krull was asked to sign a warrant to search the residence of Destiny Fremont, a woman whose name Magistrate Krull recognized from his private practice. 749 N.W.2d at 235. Krull had filed a custody action on behalf of his client against Fremont, and that civil matter was pending at the time the officer presented the warrant for Magistrate Krull's signature. *Id.* He was aware of his client's pending civil action against Fremont, yet he signed the warrant anyway, reasoning "that the evidence [supporting the issuance of the warrant] was overwhelming, physical in nature, and did not require him to evaluate the credibility of witnesses." *Id.* at 235–36. We held in *Fremont* that the warrant was constitutionally infirm and vacated Fremont's conviction because Magistrate Krull was not acting as a neutral and detached magistrate. *Id.* at 243–44. Magistrate Krull received a private admonition from the Commission for signing the warrant in *Fremont*. When history repeated itself six years later, Magistrate Krull again signed the search warrant presented to him after concluding *Fremont* was distinguishable because the warrant this time authorized the search of the home of his own client rather than the adverse party.

Miller did not ask Krull to withdraw for signing the warrant to search her residence, and he continued to represent her in the modification action and prepare for trial. Seven days before the scheduled trial date, the parties exchanged witness and exhibit lists. On September 12, two days before trial, Thomas Arndt's counsel sent Krull an updated witness list naming Magistrate Krull as a witness relating to his issuance of the search warrant. Arndt's counsel filed a motion to disqualify Krull from representing Miller. The next day the district court judge conducted a telephonic hearing. The judge granted the motion to disqualify Krull and continued the trial to allow Miller to retain new counsel. His order stated:

> A common fact issue in both the search warrant proceedings and this modification action is the behavior and conduct of [T.A.]. This modification action and the issuance of the warrant both impact the legal status of [T.A.]. Given the overlap and interconnection of the search warrant proceedings and this modification action, it is the opinion of the Court that the ethical rules . . . require Mr. Krull to withdraw from further representation of [Miller] in this case.

The order required Krull to file a motion to withdraw on or before September 21. Krull was upset with the order, believing T.A.'s conduct to be irrelevant to the modification action. He considered the motion to disqualify him a ploy by opposing counsel to get a continuance. He immediately called Miller and explained his disqualification, then dictated his withdrawal to an assistant and asked her to contact Miller to sign it. He also contacted another attorney to discuss representing Miller going forward, personally delivered Miller's file to her new counsel, and promptly refunded the balance of Miller's trust account. However, Krull's written withdrawal was mistakenly placed back in Miller's file and was neither signed by Miller nor filed with the court. On October 23, the district court judge phoned Krull to inform him that he would be filing a

complaint with the Commission and noted that Krull had not filed his withdrawal. Krull was surprised to learn that his withdrawal had not been filed and filed it as soon as Miller signed it on October 31.

Meanwhile, on October 26, the district court judge filed his complaint against Magistrate Krull with the Commission. The complaint recounted the foregoing events and noted Magistrate Krull had previously violated ethical rules by signing the search warrant in *Fremont*. The Commission informed Magistrate Krull of the complaint, and he responded by letter on February 4, 2013. Magistrate Krull admitted the facts and explained his thinking in both *Fremont* and his representation of Miller. He described the circumstances of his oversight that delayed the filing of his written withdrawal from Miller's case. He admitted to the Commission, "I now understand that I should not have issued the search warrant . . . . [M]y review was too narrow. I was too much focused on wanting to carry out my official responsibility in the issuance of search warrants." Magistrate Krull also pledged that, "For the future, I will not as a magistrate act in that capacity in any matter which has any relationship to my representation of a client in my capacity as a lawyer."

The Commission charged Magistrate Krull with several violations of the Iowa Code of Judicial Conduct, specifically part III(B) of the application section, rule 51:1.2, and rule 51:2.11. The Commission conducted an evidentiary hearing on June 19. Magistrate Krull testified that he had changed his practices since signing the Arndt warrant and now considers it his duty to recuse himself, even as to former clients, if it might give rise to any appearance of impropriety. When questioned about missing the withdrawal deadline, he explained that when he was initially disqualified from representing Miller, he felt blindsided and was "kind of hot yet." When the Commission asked Magistrate Krull whether

T.A.'s criminal behavior was relevant in the modification proceeding, Magistrate Krull answered, "I understand where the judge is coming from, and I can accept where the judge is coming from, and I've adopted that into my analysis of matters since." At the same time, Magistrate Krull continued to assert that T.A.'s criminal activity was largely his own responsibility as a sixteen-year-old boy and did not impact the custody determination. Magistrate Krull asked the Commission to distinguish *Fremont*, arguing that the two incidents were so far apart in time and circumstances that they do not constitute a pattern. Magistrate Krull called several witnesses, including local attorneys who testified he conducted himself fairly, knowledgeably, and with integrity and high moral character on the bench. These witnesses added that Magistrate Krull was always well prepared and competent and gave examples of Magistrate Krull recusing himself when necessary.

Magistrate Krull asked the Commission to impose no more than another private admonition. The Commission instead filed an application with this court to discipline a judicial officer pursuant to Iowa Code section 602.2106 (2011). The Commission recommends that Magistrate Krull receive a public reprimand.

## II. Standard of Review.

"The supreme court may retire, discipline, or remove a judicial officer from office or may discipline or remove an employee of the judicial branch for cause . . . ." Iowa Code § 602.2101. "Our standard of review of a recommendation of judicial discipline by the commission on judicial qualifications is de novo." *In re McCormick*, 639 N.W.2d 12, 15 (Iowa 2002). The ethical violation of the judge must be established by a convincing preponderance of the evidence. *Id.* We give respectful consideration to the Commission's findings and recommended sanctions,

but are not bound by them. *In re Eads*, 362 N.W.2d 541, 550 (Iowa 1985).

### III. Violations.

We first determine whether Magistrate Krull's actions violated the Iowa Code of Judicial Conduct. Magistrate Krull admitted the facts charged by the Commission and acknowledged that he was wrong to sign the warrant. Even so, "it is our duty to review the findings of the Commission de novo and evaluate the facts to determine if a violation occurred." *In re Dean*, 855 N.W.2d 186, 189 (Iowa 2014). "In order to sanction a judge, a violation of the rules must be 'substantial.' " *Id.* at 191 (quoting Iowa Code § 602.2106(3)(*b*)). In determining whether a violation occurred and what sanction is appropriate, "we look to both attorney and judicial disciplinary cases and note that principles in attorney disciplinary matters are generally applicable to judicial disciplinary matters." *Id.* at 189. But, a judicial officer is "held to a higher standard of conduct by virtue of his office." *In re Gerard*, 631 N.W.2d 271, 277 (Iowa 2001). If we find that the Commission's application for discipline should be granted in whole or in part, we are authorized by statute to render the decree that we deem appropriate. Iowa Code § 602.2106(4). Based on our de novo review, we agree with the Commission and conclude that Magistrate Krull violated three provisions of the Iowa Code of Judicial Conduct.

The application section of the Iowa Code of Judicial Conduct states in relevant part: "A judge who serves repeatedly on a part-time basis or under a continuing appointment . . . shall not act as a lawyer in a proceeding in which the judge has served as a judge or in any other proceeding related thereto." Iowa Code of Judicial Conduct, Application III(B). A violation of this provision may trigger discipline. The issue is

whether the custody modification proceeding is related to the proceeding to issue the warrant signed by Magistrate Krull. Magistrates generally are precluded from signing warrants to search the property of a party to a civil case in which the magistrate is counsel of record. *Cf. Fremont*, 749 N.W.2d at 243 (holding a magistrate in that circumstance cannot be neutral). This is true regardless of whether the warrant was otherwise proper in all respects and inevitably would be signed by another judicial officer. *Cf. id.* at 235–36, 243–44 (noting "overwhelming" evidence supported warrant). Magistrate Krull signed the warrant authorizing the search of his client's home to seek evidence against her son, the target of the criminal investigation, while he simultaneously represented the mother in the civil proceeding to modify custody over the son. The findings from the search could have influenced the outcome of the custody case, as the district court judge noted. We determine the pending action to modify custody was a proceeding related to the application for a warrant to search the same parties. With the benefit of hindsight, Magistrate Krull concedes he should not have signed the warrant, and he does not challenge the judge's ruling compelling his withdrawal from the modification action. Magistrate Krull should have realized the need to recuse himself at the time based on *Fremont*. His contemporaneous recognition that his client might be upset and terminate his representation was a red flag. We conclude Magistrate Krull violated part III(B) of the application section by signing the warrant to search his client's home.

Iowa Code of Judicial Conduct rule 51:2.11(A) provides, "A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned . . . ." The terminology section of the Iowa Code of Judicial Conduct defines "impartiality" as the

"absence of bias or prejudice in favor of, or against, particular parties."
*Id.*, Terminology. The "test is not whether the judge self-questions his own impartiality, but whether a reasonable person would question it." *State v. Mann*, 512 N.W.2d 528, 532 (Iowa 1994) (addressing nearly identical language in former version of the rule). Recusal was required here under that reasonable-person test. Magistrate Krull failed to realize acting on the search warrant application put him in a lose–lose position. If he rejected the search warrant, his motive for doing so could be questioned by Northwood law enforcement. If he granted the search warrant, T.A. could argue that he was "bending over backward" not to appear to be favoring his client, T.A.'s mother. Either way, his independent judgment could be called into question. As it turned out, his forced withdrawal the day before the trial prejudiced his client by prolonging the custody litigation due to the continuance required to enable her to retain new counsel.[2] Magistrate Krull's dual roles as private attorney and judicial officer were incompatible, and he could not address that inherent conflict through the informed consent of his client or a rule of harmless error. *See Fremont*, 749 N.W.2d at 243–44. We

---

[2]Magistrate Krull argues the opposing party in the custody-modification action filed the motion to disqualify him for tactical reasons to postpone the trial. We skeptically view motions to disqualify counsel filed by a litigation adversary. *See, e.g.*, *Engineered Prods. Co. v. Donaldson Co.*, 290 F. Supp. 2d 974, 980 (N.D. Iowa 2003) ("Because of the potential for abuse by opposing counsel, disqualification motions should be subjected to particularly strict judicial scrutiny."); *Bottoms v. Stapleton*, 706 N.W.2d 411, 415 (Iowa 2005) ("The right of a party to choose his or her own attorney is important, . . . [and] a court must also be vigilant to thwart any misuse of a motion to disqualify for strategic reasons."); *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Ouderkirk*, 845 N.W.2d 31, 40 (Iowa 2014) ("[W]e approach with caution ethics complaints initiated by a litigation adversary."). Regardless of the motive of opposing counsel, Magistrate Krull's ethical violation provided the grounds for his disqualification.

conclude he violated rule 51:2.11(A) by failing to recuse himself in this situation in which it would be reasonable to question his impartiality.

Iowa Code of Judicial Conduct rule 51:1.2 provides: "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." This rule is found in canon 1, which "addresses the need for judges to preserve the crown jewels of the judiciary—independence, integrity, and impartiality—and directs judges to uphold the fundamental qualities of judging by avoiding impropriety." *In re Block*, 816 N.W.2d 362, 364 (Iowa 2012). We must decide whether Magistrate Krull created the appearance of impropriety by signing the search warrant and thereby eroded the public confidence in the judiciary. *See* Iowa Code of Judicial Conduct R. 51:1.2 cmt. 1 ("Public confidence in the judiciary is eroded by improper conduct and conduct that creates the appearance of impropriety. This principle applies to both the professional and personal conduct of a judge."). Judges are held to a higher standard of conduct than attorneys because of the importance of maintaining an impartial judiciary. *See Fremont*, 749 N.W.2d at 242 ("The canons of judicial ethics are designed not to protect individual defendants, but to protect the judiciary from charges of partiality. The canons of judicial ethics thus often extend further than what is constitutionally required." (Citations omitted.)); *In re Gerard*, 631 N.W.2d at 277 (Canon 1 "imposes a duty upon a judge that rises above the normal responsibilities that he has as an attorney."); *In re Eads*, 362 N.W.2d at 551 ("The canons of conduct recognize that public confidence in the judiciary is eroded by irresponsible or improper judicial conduct. In certain areas judges accept restrictions on their conduct that might be

viewed as burdensome by the ordinary citizen and should do so freely and willingly." (Internal quotation marks omitted.)).

In his letter to the Commission, Magistrate Krull admitted he should have recused himself in both *Fremont* and this case, but he explained, "I was too much focused on wanting to carry out my official responsibility in the issuance of search warrants." Regardless of his subjective intent, his decision to issue the warrant raised reasonable questions about his impartiality and independence. *See In re Worthen*, 926 P.2d 853, 871 (Utah 1996) (" 'A judge acting in a judicial capacity may be found to have engaged in prejudicial judicial conduct, although his conduct was undertaken in subjective good faith . . . .' " (quoting *In re Zoarski*, 632 A.2d 1114, 1119 (Conn. 1993))). When a judge who is also a lawyer for a party being searched signs a warrant, there is at least an appearance of impropriety. Even if Magistrate Krull's conduct caused no harm to his client, it was improper because it called into question the impartiality of the Iowa judiciary. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Howe*, 706 N.W.2d 360, 373 (Iowa 2005) (noting that "some conflict-of-interest rules protect not only the rights of clients, but also 'the integrity of the legal system' " (quoting 1 Geoffrey C. Hazard Jr., et al., *The Law of Lawyering* § 10.2, at 10-7 (3d ed. 2004 Supp.))). Magistrate Krull was required to recuse himself from acting on the search warrant. We conclude that by signing the warrant, he violated rule 51:1.2.

**IV. Sanction.**

"The focus of sanctions in judicial disciplinary proceedings is not to punish the individual judge, but to restore and maintain the dignity, honor, and impartiality of the judicial office, and to protect the public . . . ." *In re McCormick*, 639 N.W.2d at 16. "Discipline is also imposed to

. . . deter other judges from engaging in unethical conduct." *In re Block*, 816 N.W.2d at 365. The Commission has the authority to recommend that a judge be disciplined and to recommend a specific sanction. *In re Carstensen*, 316 N.W.2d 889, 892 (Iowa 1982). The Commission recommends that we publically reprimand Magistrate Krull. "We give respectful consideration to those recommendations, although we are not bound by them." *In re Eads*, 362 N.W.2d at 550. As in attorney discipline cases, we decide the appropriate sanction on a case-by-case basis. *Cf. Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Plumb*, 589 N.W.2d 746, 748 (Iowa 1999). We consider all aggravating and mitigating circumstances to tailor the sanction. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Earley*, 774 N.W.2d 301, 308 (Iowa 2009).

In judicial discipline cases, we have identified factors to consider, including:

> 1. whether the misconduct is isolated or a pattern of misconduct;
>
> 2. the nature, extent, and frequency of the acts of misconduct;
>
> 3. whether the misconduct occurred in or out of the courtroom;
>
> 4. whether the misconduct occurred in the judge's official capacity or in his or her private life;
>
> 5. whether the judge has acknowledged or recognized the misconduct;
>
> 6. whether the judge has made an effort to change or modify his or her conduct;
>
> 7. the length of service on the bench;
>
> 8. whether there have been any prior complaints;
>
> 9. the effect of the misconduct upon the integrity of and respect for the judiciary; and
>
> 10. the extent to which the judge exploited the judicial office to satisfy personal interests.

*In re Block*, 816 N.W.2d at 365–66. Finally, we will consider sanctions imposed in similar situations. *See, e.g., id.* at 366 (considering the sanction given in similar cases both in Iowa and in other jurisdictions).

We agree with the Commission that it is significant Magistrate Krull previously was admonished for issuing the *Fremont* search warrant. Magistrate Krull argues that these two cases are so separated by time and particular facts that they do not constitute a pattern of misconduct. We disagree. In both matters, Magistrate Krull signed a warrant to search the property of a party in pending civil litigation in which he was counsel of record. Both transgressions carried adverse consequences—in *Fremont*, Magistrate Krull's conflict required us to vacate a conviction, 749 N.W.2d at 244, and here, the parties were subjected to delay and additional expense resulting from the continuance of the trial and retention of new counsel. In both cases, Magistrate Krull's conflict between his public and private roles led to an appearance of impropriety. He should have learned from *Fremont* to recuse himself from any search warrant application targeting someone who is a party in a case in which he is counsel of record. His prior admonishment for violating the same rules is an aggravating factor.

Magistrate Krull cooperated with the Commission and acknowledged his mistakes and corrective measures taken to avoid repeating them. His cooperation, contrition, and corrective measures are mitigating factors. *Id.* at 365–66; *see also In re Dean*, 855 N.W.2d at 193. Although he explained why he did not realize the need to recuse himself at the time he signed the warrants, we do not consider Magistrate Krull's mistaken belief he was acting properly to excuse his misconduct. *Cf. In re Meldrum*, 834 N.W.2d 650, 653 (Iowa 2013) (concluding that it was not an excuse that Meldrum was unaware his conduct violated a judicial

canon); *Howe*, 706 N.W.2d at 378 (explicitly crediting Howe with the motivation "to resolve city charges in a fashion that was just to the city as well as to defendants," but noting his conduct still "crossed the line").

Importantly, however, Magistrate Krull was motivated not by personal gain, but by his desire to carry out his judicial duties and serve the people of Worth County. He realized if he recused himself, the nearest available judicial officer was at least thirty miles away. There is no evidence that Magistrate Krull signed the warrant to gain an improper advantage for his private client. We weigh the appropriate sanction mindful of the "duty to sit"[3] to fulfill judicial responsibilities. We consider Magistrate Krull's motivation to honor that duty as a mitigating factor.

The duty to sit is set forth in our judicial canons. Rule 51:2.7, entitled "Responsibility to Decide" states, "A judge shall hear and decide matters assigned to the judge, except when disqualification is required by rule 2.11 or other law." Iowa Code of Judicial Conduct R. 51:2.7. Rule 51:2.1 states, "The duties of judicial office, as prescribed by law, shall take precedence over all of a judge's personal and extrajudicial activities." *Id.* r. 51:2.1.

> Although there are times when disqualification is necessary to protect the rights of litigants and preserve public confidence in the independence, integrity, and impartiality of the judiciary, judges must be available to decide matters that come before the courts. Unwarranted disqualification may bring public disfavor to the court and to the judge personally. The dignity of the court, the judge's respect for fulfillment of judicial duties, and a proper concern for the

---

[3]The duty to sit was accepted generally in federal practice until 1974, when Congress amended 28 U.S.C. § 455, consistent with the then-existing version of the ABA Model Code. Debra Lyn Bassett & Rex R. Perschbacher, *The Elusive Goal of Impartiality*, 97 Iowa L. Rev. 181, 202 (2011). A significant minority of states still expressly recognize the duty to sit. *Id.* at 202 n.114.

burdens that may be imposed upon the judge's colleagues require that a judge not use disqualification to avoid cases that present difficult, controversial, or unpopular issues.

*Id.* r. 51:2.7 cmt. 1. We have said that " 'there is as much obligation for a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is.' " *State v. Biddle*, 652 N.W.2d 191, 198 (Iowa 2002) (quoting *Mann*, 512 N.W.2d at 532).

As another court observed:

> To reiterate, in the absence of a genuine basis for recusal or disqualification, an inappropriate recusal or disqualification would "simply be shirking" and "irresponsible." Indeed, Delaware's approach reflects an obvious tenet: that there is a duty incumbent on judges "not to unreasonably burden fellow judges by recusing in response to a weak argument for disqualification." Upon proper motion for disqualification, a judge's decision should . . . not [be] guided or influenced by factors such as convenience or a desire to remove the allegations of bias from the case.
>
> Taken together, the foregoing case law and Delaware Code of Judicial Conduct confirm a judge's important "duty to sit" unless and until genuinely convinced of the need for recusal or disqualification.

*State v. Desmond*, No. 91009844DI, 2011 WL 91984, at *12 (Del. Super. Ct. Jan. 5, 2011) *aff'd*, 29 A.3d 245 (Del. 2011) (footnotes omitted). As a commentator explained:

> There are at any juncture only a finite number of available judges. The recusal of one judge puts greater pressure on judges that are not disqualified, particularly in smaller districts with fewer sitting judges. To a degree, the duty to sit, at least in its benign form, is in large part a duty not to unreasonably burden fellow judges by recusing in response to a weak argument for disqualification.
>
> To combat a judge's potential urge to avoid demanding, time-consuming, or controversial cases, the legal profession has long taken the view that the nature of a judgeship implies that the judge has a responsibility to hear and decide cases, one that should not be shirked for political or personal reasons. To the extent one views the duty to sit as a general and rebuttable obligation to preside over a case unless disqualified, it is unobjectionable.

Jeffrey W. Stempel, *Chief William's Ghost: The Problematic Persistence of the Duty to Sit,* 57 Buff. L. Rev. 813, 820–21 (2009) (footnotes omitted). To be clear, a desire to avoid burdening fellow judges does not cure a conflict of interest, and judges should recuse themselves when necessary regardless of the resulting inconvenience to those seeking warrants. However, we may calibrate our judicial discipline by crediting the judge's subjective motivation to honor the duty to sit.

Magistrate Krull asks us to impose a public admonition instead of a public reprimand. "We employ professional admonitions not so much by way of criticism as to instruct the bar. We view admonitions as considerably less severe than reprimands, and consider them to be something less than actual discipline."[4] *Comm. on Prof'l Ethics & Conduct v. Liles*, 430 N.W.2d 111, 113 (Iowa 1988). He argues his position is similar to that of the part-time assistant county attorney in *Liles* who also confronted potential conflicts between his official duties and his private practice. *See id.* at 112. We recognized in *Liles* that part-time official positions are necessary to serve smaller rural populations, yet give rise to potential conflicts of interest:

> A certain ambiguity is built into Iowa's system of part-time county attorneys. The overwhelming majority of the state's county attorneys serve part-time and derive their livelihood

---

[4]The Commission may issue a "letter of caution and warning" instead of a sanction if the judicial officer's "conduct has been questionable but does not amount to misconduct, or that misconduct of a very minor nature has occurred which does not warrant formal discipline." Iowa Ct. R. 52.26. The Commission issues such admonitions privately. A *private* reprimand is no longer "an available form of discipline once we grant an application submitted to us by the Commission." *In re Block*, 816 N.W.2d at 366. We have issued public admonitions in several attorney discipline cases. *See, e.g., Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Visser*, 629 N.W.2d 376, 383 (Iowa 2001); *Comm. on Prof'l Ethics & Conduct v. Zimmerman*, 522 N.W.2d 619, 621 (Iowa 1994); *In re Frerichs*, 238 N.W.2d 764, 770 (Iowa 1976). We have never given a public admonition in an application for judicial discipline, although that option is available to us in appropriate circumstances.

largely from the private practice of law. Whatever the advantages or disadvantages of the system, it exists primarily for economic reasons. Many of our counties have comparatively sparse populations and it is felt they do not require the services of full-time county attorneys.

The legislature undertook to provide the public with county attorney services which are necessary and at the same time spare the taxpayers the greater expense of full-time county attorneys. Accordingly the statute leaves it up to the boards of supervisors of each county to determine whether the office shall be full or part-time. Iowa Code § 331.752 (1987).

A result of the plan is that part-time county attorneys, who are expected to also engage in private law practice, must walk a fine line to avoid conflicts. The two incidents involved here are typical of how public legal matters often become intertwined with private ones. A conflict of interest or the appearance of one is always a danger.

*Id.*

Similar observations apply to part-time judicial magistrates, but *Liles* is distinguishable on its facts. *See id.* Unlike Magistrate Krull, there is no indication Liles had been admonished previously. Liles shared office space with Peter Hansen, another part-time assistant county attorney. *Id.* In two instances, Liles continued to represent clients in his private practice after Hansen, as a prosecutor, filed criminal charges against persons adverse to Liles's clients. *Id.* Hansen was terminated from his position as prosecutor and later accused Liles of misconduct for continuing to represent those clients. *Id.* We concluded there was no proof Liles was involved in any actual conflict of interest because, although he shared office space with Hansen, they were neither partners nor associates. *Id.* We nevertheless concluded Liles's continued representation was "ill advised" and warranted an admonition because the nature of his arrangement with Hansen was unclear to the public, and it could appear Liles's clients gained an "advantage by reason of his public office." *Id.* at 113. By contrast, Magistrate Krull's rule

violations are clear. Indeed, Magistrate Krull admits that he should have recused himself from acting on the search warrants on both occasions.

Nevertheless, we are mindful that part-time magistrates who must avoid conflicts of interest with their private practices also face the challenges we described in *Liles*. *See id.* at 112. Many counties in Iowa employ part-time judicial magistrates who need to engage in private practice to earn a living. *Id.* Sparsely populated areas of the state such as Worth County have fewer lawyers and judges to provide access to justice. The nearest available judicial officer may be a long drive away if the resident magistrate recuses himself. Part-time magistrates must remain vigilant to avoid conflicts of interest while honoring their duty to sit. The Iowa Code of Judicial Conduct applies statewide. As the Washington Supreme Court stated, "Our legal system is based on the foundation that an independent, unbiased, and competent judiciary will interpret and apply the laws that govern us. This is paramount to the American concept of justice and fairness." *In re Disciplinary Proceeding Against Michels*, 75 P.3d 950, 957 (Wash. 2003) (en banc). Maintaining the requisite independence and neutrality of our judiciary inevitably requires some measure of personal sacrifice:

> The strength of our judicial system is due in large part to its independence and neutrality. These twin qualities help remove outside influences from judicial decision-making, and promote public respect and confidence in our system of justice. Yet, judicial independence does not come without some personal sacrifice by judges. Judicial independence and neutrality require judges to limit or abstain from involvement in a variety of activities commonly enjoyed by others . . . .

*In re McCormick*, 639 N.W.2d at 15 (citation omitted).

The sacrifices may include foregoing representation in a civil case on a matter previously addressed as a judge. *See* Iowa R. Prof'l Conduct

32:1.12. The consequences can be severe when those wearing multiple hats cross ethical lines by signing a search warrant instead of recusing themselves. The search warrant prompting today's public reprimand sought evidence of cigarettes purloined by minors. The criminal convictions vacated in *Fremont* were for possession of marijuana with intent to deliver and child endangerment. 749 N.W.2d at 236, 244. But, *Fremont's* holding would also apply to vacate a conviction for first-degree murder.

Considering all of the aggravating and mitigating factors together, we conclude that a public reprimand is the appropriate sanction here. A public reprimand is consistent with judicial discipline cases in our sister jurisdictions. *See Ky. Bar Ass'n v. Fitzgerald,* 652 S.W.2d 77, 77 (Ky. 1983) (imposing public reprimand on judge who entered a custody order transferring children from their mother to their uncle, then represented the uncle after resigning from his judicial position); *Miss. Comm'n on Judicial Performance v. Bustin,* 71 So. 3d 598, 600, 607 (Miss. 2011) (en banc) (issuing a thirty-day suspension and public reprimand for a judge who signed an arrest warrant for an opposing party in a child-custody matter based on an affidavit submitted by his own client); *Miss. Comm'n on Judicial Performance v. Atkinson,* 645 So. 2d 1331, 1337 (Miss. 1994) (en banc) (holding a public reprimand appropriate when a judge set bail for a defendant and then petitioned for a bond reduction as a private attorney); *Ohio State Bar Ass'n v. Vukelic,* 811 N.E.2d 1127, 1127–28 (Ohio 2004) (imposing a public reprimand when a magistrate failed to recuse himself when a client in a domestic relations case appeared before him on criminal misdemeanor charges); *In re Disciplinary Proceedings Against Ziegler,* 750 N.W.2d 710, 713, 736–37 (Wis. 2008) (imposing a public reprimand when a judge failed to recuse

herself from cases in which her spouse was a director of a party, even though the judge gained no personal benefit from the conflict). Accordingly, we conclude a public admonishment for Magistrate Krull's second warrant-related transgression is insufficient and a public reprimand is required.

## V. Conclusion.

For these reasons, we adopt the Commission's recommendation and publicly reprimand Magistrate Krull for his conduct.

**APPLICATION GRANTED; JUDICIAL OFFICER REPRIMANDED.**