In the Matter of the INQUIRY CONCERNING Sandra HOLIEN, District Associate Judge,

Sandra J. Holien, Respondent.

No. 00–0231.

Supreme Court of Iowa.

July 6, 2000.

Thomas J. Miller, Attorney General, and Richard A. Williams, Assistant Attorney General, for the commission.

David W. Larson of Moss & Barnett, A P.A., Minneapolis, Minnesota, and Mark McCormick of Belin Lamson McCormick Zumbach, A P.A., Des Moines, for respondent.

LARSON, Justice.

Pursuant to Iowa Code section 602.2106(1) (1997), our commission on judicial qualifications has applied to this court for an order removing a Marshall County District Associate Judge, Sandra J. Holien, for cause, as provided by section 602.2101. On our de novo review, we order that Judge Holien be removed from office.

## I. *Rules for Review.*

Iowa Code section 602.2106 establishes the procedure for acting on an application by the commission. We consider the application pursuant to rules for appeals in equity suits. Iowa Code § 602.2106(1). Under section 602.2106(3)(a), the supreme court may *retire* a judicial officer for "permanent physical or mental disability which substantially interferes with the performance of judicial duties." Under Iowa Code section 602.2106(3)(b), the supreme court may *discipline or remove* a judicial officer

> for persistent failure to perform duties, habitual intemperance, willful misconduct in office, conduct which brings judicial office into disrepute, or substantial violation of the canons of judicial ethics. Discipline may include suspension without pay for a definite period of time not to exceed twelve months.

## II. *The Charges.*

The commission charged violations of eight canons of judicial ethics and two statutory violations under Iowa Code section 602.2106(3)(b) (conduct bringing judicial officer into disrepute and willful misconduct in office).

Judge Holien challenges the commission on all of these charges and attacks the commission's procedures on several grounds. The procedural grounds urged are: (1) the commission should have appointed an "independent fact finder" to hear the matter, (2) the commission erred in denying the respondent access to the complaints against her, and (3) the com-

mission failed to properly follow our rules of evidence by considering hearsay evidence. The respondent claims her problems giving rise to the complaints were caused, or at least exacerbated, by her having to function in an atmosphere of constant scrutiny and investigation by judicial officers and employees with whom she worked.

### III. *The Procedural Issues.*

■ A. *The independent-fact-finder argument.* The respondent contends the commission should have appointed an independent fact finder because its members had been privy, prior to the hearing, to results of the investigation by an assistant attorney general appointed for that purpose under Iowa Code section 602.2104. The respondent begins with the premise that qualification commissioners are judges and therefore subject to the Iowa Code of Judicial Conduct. Judges are prohibited from ex parte communications with the "prosecutor," as she characterizes the investigator. The respondent cites Canon 3(D)(1) of the Code of Judicial Conduct, which provides that "[a] judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned. . . ."

■ Iowa Code section 602.1606(1) provides that a "judicial officer" is disqualified from acting in a proceeding if "[t]he judicial officer has . . . personal knowledge of disputed evidentiary facts concerning the proceeding." For purposes of Iowa Code chapter 602, "judicial officer" is defined as

a supreme court justice, a judge of the court of appeals, a district judge, a district associate judge, an associate juvenile judge, an associate probate judge, or a magistrate. The term also includes a person who is temporarily serving as a justice, judge, or magistrate as permitted by section 602.1612 or 602.9206.

Iowa Code § 602.1101(8). Members of the Judicial Qualification Commission are not judicial officers within this definition.

In addition, neither the Iowa Code nor the rules governing the actions of the commission contemplate a deferral to an independent fact finder. *See* Iowa Code §§ 602.2101–602.2107; Comm'n on Judicial Qualifications R.P. 1–23. We reject this argument; the statute clearly contemplates that the commission will act as fact finder, and there is no provision for the appointment of an independent body for that purpose.

■ B. *Disclosure of complaints.* The respondent argues she was entitled to know who brought complaints against her and the details of those complaints. Denial of that information, she claims, was presumptively prejudicial to her. In *In re Stigler,* 607 N.W.2d 699 (Iowa 2000), we held that after the filing of specific charges by the commission the judge should be given the same right of discovery as that available to members of other professions who face charges of misconduct before boards or agencies. *Stigler,* 607 N.W.2d at 706. In *Stigler* we held that the complaint made against the judge and any documentation submitted by the complainant should have been available to the judge on request at any time after the filing of formal allegations of misconduct. *Id.* However, as in the *Stigler* case, the commission's failure to allow discovery of the complaints in this case did not prejudice Judge Holien because all of the charges against her were set forth in detailed and precise allegations of events in which she was personally involved. *See id.* at 707.

■ C. *Application of rules of evidence.* The respondent claims the commission is required to follow the Iowa Rules of Evidence, and because it had considered inadmissible materials prior to her hearing, she was prejudiced. The commission's rules provide that "the presentation of evidence shall conform to the Iowa rules of civil procedure and the Iowa rules of evidence insofar as such rules may be applicable to cases tried in equity." Comm'n on Judicial Qualifications R.P. 14(b). The respondent's specific objection

in this case is that the commission considered the investigative report brought to the hearing. In a letter to the assistant state court administrator, as secretary to the commission, her Minnesota lawyer requested the administrator to ask all members of the commission to return their copies of the report prior to the hearing because they "contain[ ] volumes of inadmissible conclusions, hearsay, and opinions." The commission, responding for the court administrator, denied the request. The reason was, at least in part, a pragmatic one: "everybody has read what was in that material [and] there's really no way for anybody to erase what's in their mind."

The respondent does not cite any specific rules of evidence she claims were violated, but we assume her claim is that the report was inadmissible as hearsay. We believe the commission properly considered the investigative report because that is obviously the purpose behind the statute authorizing investigation. An investigation would be meaningless if the commission members were not allowed to consider the results of it prior to deciding what further proceedings were necessary. See Iowa Code § 602.2104(1) (providing for employment of investigator and for alternative resolutions—from informal disposition to formal commission hearing). In order to make those initial determinations, of course, it would be necessary for the commission members to read the investigative report.

We reject this as well as the other procedural arguments raised by the respondent.

## IV. *The Evidence.*

■ A. *Violation of statutory and rule requirements.* Iowa Code section 602.1601 provides that "[a]ll judicial proceedings shall be public, unless otherwise specifically provided by statute or agreed to by the parties."

The commission charges the respondent violated this statute by failing to keep her court open to the public and by creating a de facto closed courtroom by creating a hostile environment. She is also charged with failing to follow the Iowa Rules of Criminal Procedure regarding arraignments and trial settings.

For a time, Judge Holien conducted initial appearances in her office, not allowing even the peace officers guarding the prisoners to be present in chambers. This effectively prevented the county attorney, the public defender, domestic abuse case workers, and the public from being present. Refusal to admit peace officers also created safety concerns. On one occasion, the respondent had her court attendant place a sign on the public doors to her courtroom stating, "Do Not Enter Courtroom When Court is in Session," on a day when guilty pleas and sentencings were taking place. When members of the public came into her courtroom, she would make inquiries into the reasons why they were there. Many witnesses testified there was an unwritten rule you did not enter her courtroom while a hearing was taking place.

Under Iowa Rule of Criminal Procedure 8(1), once a county attorney files a trial information, the defendant is to be provided a copy of it before entering a plea. The rule also requires either a written arraignment on a prescribed form or a formal arraignment in open court. The rule contemplates that, at the time of the plea, the defendant will inform the court if the defendant is charged in their true name. Also, in the procedure provided by rule 8, a defendant may enter a guilty plea before a trial date is set and, if the defendant desires more time before disposition, may waive speedy trial.

Judge Holien has persistently followed her own procedures, which clearly violate the procedural requirements of the rules. She conducted arraignments in a way contrary to the provisions of rule 8. When she found probable cause based on the trial information, she approved it by signing it. She would then enter an order setting the

arraignment for a time within a few hours of the time the information was filed, often making it impossible for attorneys to meet with their clients prior to entering pleas. Within a few hours of that order, she would sign a document called "record of arraignment," indicating an arraignment was held, despite the fact it was done without contact with the defendant or their attorney and not in open court. The "record of arraignment" would routinely note a not guilty plea was entered and set the case for trial within four weeks. This method was used to arraign defendants charged with OWI (third offense), a class "D" felony, ordinarily requiring the presence of the defendant unless a written arraignment form is filed. *See* Iowa R.Crim. P. 25(1).

Judge Holien was also innovative in the way she handled no-contact orders. Iowa Code section 236.5(2) requires the order to state whether a person is to be taken into custody by a peace officer for a violation of the terms of the order. However, Judge Holien did not do this. She seldom used the standardized form and would often simply note "no contact" on the record of initial appearance. Nothing in the order indicated whether a person was to be taken into custody on a violation of the order. Under this practice, there was no record of whether the subject of the order received a copy of it. All parties involved were left to wonder if such "orders" were enforceable. Despite requests by local domestic abuse personnel that the respondent comply with proper procedures, she adamantly refused to do so except for a very brief period after she received a letter urging her to comply with accepted procedures. She soon reverted to her old ways.

We conclude the respondent's refusal to abide by statute and rules with respect to public access to her courtroom and with respect to accepted procedures violated Canon 1 of our Code of Judicial Conduct ("A judge should uphold the integrity and independence of the judiciary."). It also violated Canon 2 ("A judge should avoid impropriety and the appearance of impropriety in all activities."). Comment A to Canon 2 makes that canon particularly relevant to this case:

A judge should respect to and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

B. *The respondent's treatment of court personnel, attorneys, and the public.* While Judge Holien's failure to abide by applicable statutes and rules showed a failure to maintain respect for and compliance with the law, most of the testimony at the hearing and the bulk of the commission's thirty-eight-page report concerned a deeper problem: Judge Holien's frequent conflicts with almost all of the people with whom she came in contact. These included the chief judge, the other judges of the Second Judicial District, the district court administrator, several court reporters (although at least two apparently had no problems), court attendants, clerk's office employees, peace officers, domestic violence personnel, department of corrections employees, attorneys, and the public. The depth and breadth of her hostilities must have touched every aspect of her judicial services in Marshall County. She has been like the proverbial bull in a china shop. She refused any meaningful attempts to discuss her problems with the chief judge and, after just one meeting with him, refused to talk to him. She directed him to her lawyer in Minneapolis who spoke for her. It seems the more efforts that were made to resolve the problems the more she dug in her heels.

1. *The court reporters.* Judge Holien's relationship with her court reporters became so hostile it was difficult to find reporters for her. In 1994 her relationship with her regular reporter, Karen Hill, became strained. According to the respondent, this was because Ms. Hill was gathering information about the then-county attorney and forwarding it to the county attorney's opponent in the upcoming elec-

tion. The respondent complained this was a breach of trust and a "betrayal" of the judge, although the information gathered was public information—primarily the incumbent's won/lost record in district court. The judge-reporter relationship continued to sour. Judge Holien returned Ms. Hill's Christmas gift. She stopped talking to Ms. Hill and began to type her own orders and judgment entries that had ordinarily been typed by her court reporter. Because of the escalating level of hostility, Ms. Hill transferred to another judge. Ms. Hill's replacements, Connie Overberg, and Jodi Vanderheiden, were subjected to sarcastic remarks and other discourteous acts in the courtroom. Ms. Vanderheiden quit because of the judge's temper.

Brenda Ellefson was another reporter assigned to the judge. One day when she was to report a criminal case, she found that the respondent had announced to court personnel that Ms. Ellefson was an unsuitable reporter (although she clearly was not), and the respondent refused to hear the case. She continued it until a later time, which, according to some of the evidence, caused problems with respect to the defendant's speedy trial rights.

Because Judge Holien was widely viewed as being abusive toward her court reporters, the court administrator found it impossible to get an official reporter for her. Several roving reporters hired to work with her testified at the commission hearing they were subjected to outbursts of yelling, temper, and public embarrassment at the hands of the respondent. One of the roving reporters said she had a "sick" feeling at the end of the day.

Two temporary reporters, Marcy Anderson and Jill Madsen, experienced similar problems. Ms. Anderson testified that the respondent had a terrible temper and was generally snippy to her. Ms. Anderson also observed the respondent making fun of various court personnel in a demeaning way. Jill Madsen was a freelance reporter who testified to similar treatment. The respondent yelled at her for talking with attorneys and criticized her for having conversations with employees in the county attorney's office. When Ms. Madsen was late getting into the courtroom for some reason, the respondent made sarcastic remarks in the presence of people in the courtroom.

2. *Court administration.* Judge Holien's unique manner of conducting arraignments, entering not guilty pleas for defendants and setting their cases for trial without input from any of the attorneys, as already discussed, violated several procedural rules, but it also created problems for court administration. For example, the respondent's self-created trial schedule placed approximately eighty cases for trial on the same day. The respondent kept her own records. When Judge Newell came to Marshalltown to fill in for Judge Holien after she was suspended, he could not determine how many cases were pending. Not even the clerk's office could tell him because of the way the respondent had done her private scheduling.

The respondent refused to reply to inquiries from court administrator David Hayward. She even refused to accept a message from the court administrator regarding court reporter scheduling. The respondent accused the court administrator of "spying" on her through others, although there was no evidence of this.

When the court administrator wrote a letter asking the respondent for an explanation of her behavior toward one of her court reporters, the respondent did not reply. Her lawyer in Minnesota, however, responded in rather vague terms. The court administrator was not satisfied, and he wrote to the respondent for further explanation. Again, she did not respond, but her Minnesota lawyer did. He informed the court administrator that a confidential relationship existed between a judge and her court reporter, so the judge did not have to give details as to any problems she was having with her court

reporters. In this connection, the court administrator testified:

> I tried to talk to Judge Holien on a number of occasions, and, in fact, I came to Marshalltown in June of '96 to—and a couple of times to discuss the handling of prisoners. Judge Holien on both occasions told me that she was angry that I was here. She glared at me, and frankly she really—I mean it was just unbelievable how hostile she was.

> And, frankly, after that I think in the correspondence there was some notation that she preferred that any contact about these issues would go through her attorney....

The court administrator attempted to set up meetings with the respondent, Chief Judge Schechtman, and the judge's lawyer in Minnesota—all to no avail. The court administrator summed up his feelings by testifying "frankly, I didn't want to deal with her any more than I had to."

3. *Trial judges.* The respondent's relationship with her fellow judges in her district was almost nonexistent—often hostile. From July of 1995 until she was suspended in 1999, she did not attend any district or state judicial meetings. She obtained her continuing legal education in Minnesota, apparently dealing with Minnesota law.

As evidence of her hostility, when Judge Newell was first appointed, he came to Marshalltown to observe a district associate judge in action, and he was met with total rejection. He attempted to meet the respondent "just to be friendly." Judge Holien refused to meet him, and she told a court attendant to inform him she was too busy to see him. As it turned out, she had plenty of time; her scheduled trial had been canceled.

Carlynn Grupp is a district associate judge in the second district. At Chief Judge Schechtman's request, she called the respondent to discuss sentencing procedures. She testified to a significant change in Judge Holien's demeanor as compared to earlier in their association. She testified:

> Prior to this time when I had called her, if she was in chambers, she would pick up the phone; and we would visit about whatever the matter was.

> On that day when I called her, she picked up the phone. We basically said hello, and I started to tell her that Judge Schechtman and I had had this conversation, and I wanted her input.

> As soon as we discussed that, she just hung up the phone. She said to me words to the effect, "I don't want to talk to you. You don't want to talk to me about this. Call one of the other judges." She just hung up the phone.

> And I had never had an experience with her when she would be that way; either professionally when I was just calling her about professional information, or personally. So that was very unusual for me.

> . . . .

> I wrote her a letter the next day explaining my questions, what my intent was and basically apologizing if I had done anything that she found was trivial or inappropriate in my approaching her. She did not respond to the letter.

> And so I tried over the next month or two several times to telephone her again because I didn't understand what had happened to our relationship or why she would react in that manner basically also to tell her that I thought that that was probably inappropriate.

> When the phone would ring, it simply rang and rang; and it didn't matter what time of day I would call. She never answered the phone again when I called her.

Judge Carl Peterson is a district judge who offices primarily in the Marshalltown courthouse—although on a different floor from Judge Holien's. He testified Judge Holien apparently did not like him, although he did not speculate why. Once, when he started to enter an elevator with

the respondent, she refused to ride with him, saying she would take a different elevator. Because Judge Peterson saw things going badly between Judge Holien and others in the court system, he attempted to talk to her. The meeting soon turned into a shouting match, with Holien doing most of the shouting. Judge Peterson testified:

> I went down there with the idea of trying to see if we can make things better. It just didn't go well. And I really felt sad coming out of there because I don't know that I have trouble communicating. And I certainly didn't in that situation. It just didn't work.

4. *Court attendants.* Three court attendants testified about their treatment by the respondent. Margie Mathis was concerned for her safety when the respondent, contrary to law and accepted practice, held initial appearances in her chambers without allowing the presence of peace officers. Ms. Mathis testified that work conditions with the respondent were so unpleasant she decided to resign. Judge Holien apologized and promised to treat her better. She did treat her better for a short time but soon reverted to her old ways. Ms. Mathis testified to public embarrassment at the hands of the judge, angry moods, and bizarre conduct that finally led her to resign permanently.

Two other court attendants, Diane Pennell and Annette Lemker, also were the objects of her hostility. Ms. Pennell testified the judge created such stress in her life she went home sick on several occasions. Ms. Lemker resigned because of the judge's hostilities toward her.

5. *Clerk's office personnel.* The respondent treated employees of the clerk's office as she did others in the judicial system—with rudeness, anger, and hostility.

One employee of the clerk's office testified that the judge wrongfully accused members of the office of making a rubber stamp of the judge's signature and using it on court reporter's certificates. Another employee, Amy Wignall, brought a misdemeanor ticket to the respondent because the magistrate who would have ordinarily handled it had a conflict of interest. The respondent told Ms. Wignall in a rude way that she did not do simple misdemeanors. Ms. Wignall went to a district court judge to take care of the matter, since the respondent had refused to act.

The clerk's office also had problems with Judge Holien keeping files with stamped documents in her chambers. She refused to return them in a timely manner, causing the clerk's office to delay the mailing of notices. This led to many arguments between Judge Holien and the clerk's office.

The respondent also refused to follow the proper procedures with respect to the confidential minutes attached to trial informations on file with the clerk. Judge Holien would discard the envelopes designed to preserve confidentiality and return the files to the clerk's office without the envelope. The result was that the minutes became open for public view, contrary to law and established procedures.

Frequently, the respondent would enter the clerk's office shouting for assistance. The clerk found it difficult to find people in her office who were willing to deal with her.

6. *Other persons dealing with the respondent.* Personnel directly employed in the court system were not the only ones who experienced the wrath of this respondent. Peace officers, attorneys, correction officers, and domestic violence caseworkers, as well as members of the public were also subjected to her hostility.

For example, when peace officers brought prisoners to court, the respondent would make rude and embarrassing remarks to the officers. Several times she asked the officers why they were spying on her. Judge Holien's attitude became so hostile toward peace officers that in August of 1997 the chief jailer wrote a letter to her asking her to conduct herself in a

respectful way when doing initial appearances in the county jail. When the respondent's treatment of peace officers continued to be rude and intemperate, the Marshalltown Police Department complained to the court administrator. The court administrator contacted Judge Holien, who refused to respond.

7. *Attorneys.* Although other attorneys testified to hostile treatment, we highlight two specific cases. In one case, the Marshall County Attorney testified the respondent became so angry over a missing file (for which she was apparently responsible) she ordered the defendant back to jail, a move the county attorney thought was harmful to the defendant. In another case, a criminal defendant became so upset with the respondent's behavior the hearing had to be continued.

Defense attorneys complained their clients' rights were compromised because of the judge's unorthodox way of "arraigning" defendants by simply entering an order without input from the attorneys. Defense attorneys attempting to file motions that must be filed within a certain time following arraignment were surprised to hear their time was up before they even knew there had been an "arraignment." Defense counsel were also surprised to find, when they wanted to press for a speedy trial, that their clients had "agreed" to continuances as to which the defendant and lawyers had no knowledge.

8. *Other witnesses.* Many other witnesses testified. (There were eighty-four witnesses, and the hearing lasted eight full days.) The gist of the testimony by most of these witnesses was that they had experienced similar encounters: the respondent was volatile, often angry, unwilling to yield even though it was clear she was wrong. She adamantly refused to follow the rules of criminal procedure and the statutory provisions for an open court. She made people fearful of offending her, fearful of working with or for her, or even being in her court. From 1994 until the respondent's suspension in 1999 hostility

and chaos were her trademarks. Civility toward fellow judges, court employees, attorneys, and the public—traits that should be valued by all judges—were almost totally lacking. In fact, her job performance was the antithesis of a judge's role as envisioned by our Code of Judicial Conduct, which provides:

## CANON 3

*A Judge Should Perform the Duties of Office Impartially and Diligently*

The judicial duties of a judge take precedence over all other activities. Judicial duties include all the duties of the office prescribed by law. In the performance of these duties, the following standards apply:

**A. Adjudicative Responsibilities.**

. . . .

(2) A judge should maintain order and decorum in all proceedings.

(3) A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity, and should require similar conduct of lawyers, and of court staff, court officials, and others subject to the judge's direction and control.

As already noted, this court has considerable latitude in the sanctions available to it. Under Iowa Code section 602.2106(3)(a), the court may *retire* a judge for "permanent physical or mental disability which substantially interferes with the performance of judicial duties." To a layperson looking at the facts of this case, it might appear the respondent has a form of mental illness—perhaps paranoia. However, neither psychiatrist who examined her in connection with this proceeding has made a diagnosis of mental illness. It would, of course, be to the respondent's advantage for us to order retirement for

disability or encourage her resignation, as opposed to our ordering her removal because of the impact removal would have on her retirement benefits. However, there is no factual basis upon which an order could be entered for her physical or mental disability retirement, and of course, a resignation would have to be initiated by the respondent.

The respondent asks us to be "innovative" in our disposition, suggesting a suspension with some form of supervision. We decline to do so. First, it would not be fair to the persons who must deal with the respondent in the performance of her duties because the bizarre conduct we have outlined was exacerbated when the respondent suspected people were watching her. If someone really is watching her, as a suspension would require, we are not at all optimistic about the effect on her behavior. Also, and more important, we believe the respondent is simply and unalterably unsuited to be a judge, and no attempts at behavior modification are going to change that significantly. She simply should not be a judge.

We order the respondent, Sandra J. Holien, removed from office effective thirty days from the filing of this opinion unless the respondent has, in the meantime, resigned her position. In the event she shall have resigned in that time, the State Court Administrator shall certify that fact to this court, and a supplemental order will be filed accordingly.

**DISTRICT ASSOCIATE JUDGE REMOVED.**

All justices concur except NEUMAN and LAVORATO, JJ., who take no part.