# In the Iowa Supreme Court

No. 24–2030

Submitted March 27, 2025—Filed April 18, 2025

In the matter of **Honorable David James Hanson,** judicial magistrate of the First Judicial District.

On application of the Iowa Commission on Judicial Qualifications.

The commission on judicial qualifications filed an application to discipline a judicial officer. **Application Granted; Judicial Officer Removed.**

Oxley, J., delivered the opinion of the court, in which all justices joined.

Brenna Bird, Attorney General, and Darrel Mullins (argued), Assistant Attorney General, for complainant.

David James Hanson (argued), Fayette, pro se.

**Oxley, Justice.**

Over twenty years ago, we said that "[t]he strength of our judicial system is due in large part to its independence and neutrality. These twin qualities help remove outside influences from judicial decision-making, and promote public respect and confidence in our system of justice." *In re Inquiry Concerning Patrick McCormick*, 639 N.W.2d 12, 15 (Iowa 2002) (citation omitted). Some today might question that underlying premise—that there is in fact public respect and confidence in the judiciary. In an age where judges are under seemingly endless scrutiny and attack, it is ever more critical that judges ensure that their words and actions are above reproach.

This is a judicial disciplinary action against Judicial Magistrate David J. Hanson (Magistrate Hanson) for the First Judicial District of Iowa related to statements he made in two separate cases that purport to demonstrate bias, prejudice, and a lack of impartiality. In one case, Magistrate Hanson denied an arrest warrant in a lengthy written order that reflected his own disparaging views about young male victims of sexual assault. In the other, Magistrate Hanson made statements in open court using a derogatory racial slur and reflecting stereotypes about a criminal defendant. The Iowa Commission on Judicial Qualifications (Commission) filed an application for imposition of discipline against Magistrate Hanson. The Commission found that Magistrate Hanson violated the Iowa Code of Judicial Conduct and recommended that he be suspended for ninety days without pay and ordered to participate in mandatory anger management and bias training.

Even more concerning than the clearly inappropriate statements Magistrate Hanson made in his written order and from the bench is his response to the Commission's application for disciplinary action. His complete lack of self-

awareness and contrition reflects an unwillingness (or inability) to change his behavior and further undermines public respect and confidence in the judiciary. Accordingly, we grant the Commission's application. But we conclude that the appropriate discipline is to remove Magistrate Hanson from his position as a judicial officer.

## I. Factual Background and Proceedings.

Magistrate Hanson graduated from Drake University Law School in 1987. He was appointed to the bench in January 2022 to serve a four-year term in Fayette County, located in Iowa's first judicial district. At the time, he had practiced law in Iowa for over thirty-six years. In Iowa, magistrates function as "part-time" judicial officers serving the county they reside in or a neighboring county. Magistrates are often the first (and sometimes only) judicial officer that members of the public encounter when the magistrate presides over "simple misdemeanors . . . , including traffic and ordinance violations, . . . preliminary hearings, search warrant proceedings, county and municipal infractions, and small claims," or when they "hear complaints or preliminary informations, issue warrants, order arrests, make commitments, [or] take bail." Iowa Code § 602.6405(1) (2024).

The fact that magistrates serve as part-time judicial officers does not excuse them from complying with the Iowa Code of Judicial Conduct, with some limited exceptions not applicable here. *See* Iowa Code of Judicial Conduct, Application I(B) ("A judge, within the meaning of the Iowa Code of Judicial Conduct, is anyone who is authorized to perform judicial functions, including an officer such as a magistrate . . . ."); *In re Inquiry Concerning Sevcik*, 877 N.W.2d 707, 711 (Iowa 2016) ("The Iowa Code of Judicial Conduct applies to both judges and part-time magistrates, with some exceptions. . . . The exceptions carve out

conduct relating to the judicial restrictions governing the practice of law, select extrajudicial activities, and public statements concerning pending and impending cases when not serving as a judge. Otherwise, the same canons of conduct applicable to Iowa judges apply to magistrates." (citations omitted)).

**A. The First Complaint.** In August 2022, approximately six months after Magistrate Hanson's appointment to the bench, the Commission received a complaint about him from the chief judge of the first judicial district based on the contents of a written order that he had recently entered denying a request for an arrest warrant. The administrative judge for Fayette County informed the chief judge of the contents of the written order, and the chief judge referred the matter to the Commission. The requested arrest warrant related to a criminal complaint involving allegations made by a fifteen-year-old boy as the victim of a sexual assault by a seventeen-year-old girl. A police officer with the West Union Police Department filed an affidavit in support of the arrest warrant, describing in detail the events giving rise to the charges as relayed to him by the alleged victim, identified in the affidavit as "John Doe."

Magistrate Hanson entered a six-page, single-spaced order denying the request for an arrest warrant on the basis that he did not find John Doe credible and therefore the warrant application lacked probable cause. In explaining the reasons for discrediting John Doe's allegations, Magistrate Hanson: (1) described John Doe's claim that he was unable to push away the female offender as "absurd" given a male's "innate physical advantage," noting that the female offender was identified as five feet eleven inches tall and weighed 290 pounds, which he suspected "most likely represents female obesity rather than muscular weight" such that John Doe's will was not likely "overridden by force"; (2) explained that "[a]ny self-respecting young male" would have simply removed

himself from any sexual touching that was truly unwelcomed, describing Magistrate Hanson's own response when he received an "unwelcome[d] sexual touch" as a teenager; (3) described John Doe's actions as "contrary to nature" because the "normal, hormone-ridden teenage boy's reaction to being undressed by a teenage girl" is, "Alright! I'm gonna GET some!"; and (4) claimed as fact what "[c]ommon human experience suggests: if a man imbibes a truly substantial quantity of alcohol, to the point that he cannot rationally consent to engage in sex[ual] relations, that man's physical ability to perform sexually also goes away until he sobers." The order then went into graphic detail about the physiology of the male sex organ—which we choose not to repeat—explaining why "[c]ommon human experience" undermined John Doe's story.

From this discussion, Magistrate Hanson declared that "John Doe knew exactly what Defendant was doing to him, welcomed the advance, and both freely consented and actively participated in the sex acts," only to "later regret[] his free will choice." He concluded the order with:

> In summation[,] Confidential informant John Doe's allegations of his curious passivity in warding off or purporting to refuse offers of sexual favors, alleged memory blackout, and weeks-later convenient memory recovery, all strike this Court as highly unnatural. And therefore unlikely to be true. The Court concludes that John Doe lacks credibility sufficient to support a criminal charge against Defendant—particularly for a charge that as applied is a forcible felony.

**B. The Second Complaint.** Less than a year later, in July 2023, and while the first complaint was still pending, the Commission received another complaint against Magistrate Hanson. This complaint was also filed by the chief judge of the first judicial district based on an email she received from a law school student working as a prosecuting intern for the summer with the Fayette County Attorney's office. The intern raised issues of bias, discrimination, and derogatory

remarks made by Magistrate Hanson in open court during a proceeding in which the intern was representing the state in prosecuting simple misdemeanor charges. As described by the intern:

> During magistrate court on July 18, 2023, Judge Hanson was reviewing a case where the defendant was of Hispanic ethnicity. Judge Hanson noted that the charges were for no license and no insurance, and asked me, "Is this guy a wetback? An illegal?" He also asked if I was sure this was the defendant's real name and commented that the defendant probably stole someone's ID card or identity.

We choose to only repeat the above-quoted racially derogatory slur in full once throughout the opinion. Those remarks in open court made the intern feel "extremely uncomfortable" and "extremely concerned about [Magistrate] Hanson's bias affecting defendants' right to an impartial jurist."

**C. The Commission's Investigation and Charges.** After receiving the second complaint, the Commission notified Magistrate Hanson that it was beginning a preliminary investigation regarding both complaints. On May 22, 2024, the Commission issued a notice of charges and hearing thereon informing Magistrate Hanson of the specific charges against him, his right to file an answer, defend, and participate at the hearing in person and by counsel, and setting a three-and-a-half-hour hearing on the matter for October 29.

The notice informed Magistrate Hanson that the conduct referred to in the charges violated canons 1 and 2 and rules 51:1.2 (promoting confidence in the judiciary) and 51:2.3 (bias, prejudice, and harassment) of the Iowa Code of Judicial Conduct. With respect to the first complaint, the Commission alleged that Magistrate Hanson's order was "unfitting of a judicial officer because it expressed bias, included unnecessary and inappropriate commentary about parties, relied on extrajudicial resources of questionable substance, applied an incorrect legal standard, and included information suggesting a conflict of

interest." With respect to the second complaint, the Commission alleged that Magistrate Hanson "made racially disparaging remarks concerning a litigant who was to appear before him in a pending case," raising "issues of bias and discrimination." The Commission concluded that its receipt of the second complaint showed that Magistrate Hanson "repeatedly failed to meet the requirements of both Rule 51:1:2 and Rule 51:2.3(A) & (B)."

Magistrate Hanson did not file an answer. The October 29 hearing was canceled after Magistrate Hanson stated at a prehearing conference on October 24 that he did not intend to challenge the complaints or the charges against him, so a hearing was not needed. Magistrate Hanson, who appeared at the conference without counsel, declined an offer to adjourn the call to obtain representation.

A subsequent hearing was held on November 14 to make a record of Magistrate Hanson's decision to forgo a hearing on the charges. When asked to confirm his prior statement that he did not intend to contest the facts alleged against him, Magistrate Hanson responded:

> There were two issues. The more -- I assume the more significant was my ruling in anger over what I thought was a specious request for an arrest warrant, and I own up to that. If I make a decision and somebody don't like it, well, I'm sorry.
>
> As far as the other one, I don't recall the circumstances, and people can say whatever they want to say. . . . [W]hatever's said I have no way of identifying, so I'm not going to even argue the point. There's no point to it.

The assistant attorney general clarified that Magistrate Hanson was entitled to a hearing where the State would be required to present witnesses to support the charges. Magistrate Hanson responded:

> Well, there's no point in dragging everybody into a day's worth of work over what looks like about four minutes worth of testimony. I'm not going to put the Commission to that. The Commission can

make whatever decision it wants to make, and I will roll with the punch and take whatever you give me.

The Commission chair then clarified that the Commission makes a recommendation to the Iowa Supreme Court, which makes the final adjudication. Magistrate Hanson responded, "Well, I guess if they want to shoot me, they can. Okay. I will accept whatever you think is right."

**D. The Commission's Application for Discipline.** The Commission filed its application to the supreme court to discipline Magistrate Hanson on December 18. The Commission concluded that the record established by a convincing preponderance of the evidence that Magistrate Hanson's conduct, as asserted in the two complaints, violated rule 51:1.2 (promoting confidence in the judiciary) and rule 51:2.3(A) and (B) (bias, prejudice, and harassment), brought the judiciary into disrepute, and that those violations were substantial violations of the canons of judicial ethics. *See* Iowa Code § 602.2106(3)(*b*) (providing that on application of the Commission, the supreme court may "[d]iscipline or remove the judicial officer for . . . conduct which brings judicial office into disrepute, or substantial violation of the canons of judicial ethics").

With respect to rule 51:1.2, the Commission concluded that "Magistrate Hanson's conduct would create in reasonable minds a perception that he engaged in conduct reflecting adversely on his impartiality, temperament, and fitness to serve as a judge." Because both incidents involved a public judicial forum—a written judicial order and statements in open court—the Commission believed the incidents "eroded public confidence more substantially than if his conduct had been purely personal."

With respect to rule 51:2.3, the Commission noted that the content of Magistrate Hanson's written order and the statements he made in open court satisfied many of the examples of manifestations of bias or prejudice identified

in the comments to rule 51:2.3. The Commission concluded that "[b]y manifesting bias or prejudice in the two proceedings at issue, Magistrate Hanson impaired the fairness of the proceedings and brought the judiciary into disrepute."

Without the benefit of any briefing from Magistrate Hanson, the Commission recommended that Magistrate Hanson be suspended for ninety days without pay and ordered to participate in mandatory anger management and bias training. The Commission relied on the facts that Magistrate Hanson's misconduct occurred in his official capacity, showed a pattern of alarming bias and prejudice, and diminished public confidence in the integrity and impartiality that a judicial officer is expected to exhibit. Noting "[n]o effort to change or modify his conduct," the Commission concluded that Magistrate Hanson's "lack of willingness to address the situation, or to express remorse, is concerning."

**E. Proceedings in the Iowa Supreme Court.** Our constitution places the final responsibility for disciplining judges with our court. Iowa Const. art. V, § 19; *see also* Iowa Code § 602.2101. But the discipline process begins with the Commission, a seven-member body made up of a district court judge; two practicing attorneys who are not from the same political party; and four electors who are not attorneys, no more than two of whom are from the same political party, and who are appointed by the Governor and confirmed by the state senate. Iowa Code § 602.2102(1). Complaints about judges are directed first to the Commission, which, after investigation, may dismiss the charges, dispose of the charges informally, or make application for discipline to the supreme court. *Id.* § 602.2104(1). And before the Commission can send the complaint to the supreme court for discipline, the judge is provided due process through notice of the charges and a hearing. *Id.* § 602.2104(2). The attorney general prosecutes

the charges on behalf of the state and the judge "may defend and has the right to participate in person and by counsel, to cross-examine, to be confronted by the witnesses, and to present evidence in accordance with the rules of civil procedure." *Id.* The judge may request the Commission to issue subpoenas on the judge's behalf for use at the hearing. *Id.* § 602.2104(3)(*b*). We lay out this process to make clear that charges made against a judicial officer provide due process for the judge at the hearing stage and are carefully reviewed and seriously considered before they reach our docket.

The Commission's application to discipline Magistrate Hanson was set for nonoral submission to our court on March 26, 2025. The State filed its brief on January 30, and Magistrate Hanson filed his responsive brief on February 28. On March 3, the State filed a request to set the matter for oral submission, noting that "upon review of the responsive brief, the State believes the Court and Magistrate Hanson might benefit from a hearing." We granted the State's request and heard argument on the matter on March 27.

**II. Analysis.**

"It is our duty to discipline judicial officers for conduct violating the canons of judicial ethics." *In re Inquiry Concerning Sevcik*, 877 N.W.2d at 711; *see also* Iowa Code § 602.2106(3)(*b*) ("Upon application by the commission, the supreme court may . . . [d]iscipline or remove the judicial officer for . . . conduct which brings judicial office into disrepute, or substantial violation of the canons of judicial ethics."). We review the Commission's recommendation to discipline a judicial officer de novo. *In re Dean*, 855 N.W.2d 186, 191 (Iowa 2014). Ethical violations supporting the discipline of a judge "must be established by a convincing preponderance of the evidence." *Id.* "We give respectful consideration

to the Commission's findings and recommended sanctions, but [we] are not bound by them." *In re Krull*, 860 N.W.2d 38, 43 (Iowa 2015).

**A. Violations of the Iowa Code of Judicial Conduct.** Magistrate Hanson has never disputed the underlying facts giving rise to the two complaints or that his conduct violated judicial ethics. And in his brief to our court, he does "not resist anything the Commission and this Court says" and does "not complain that the Commission is wrong." Rather, Magistrate Hanson attempts to explain his reasoning and make excuses for his conduct. Nonetheless, "it is our duty to review the findings of the Commission de novo and evaluate the facts to determine if a violation occurred." *In re Dean*, 855 N.W.2d at 189.

The Commission charged Magistrate Hanson with violating cannons 1 and 2 of the Iowa Code of Judicial Conduct, specifically rules 51:1.2 and 51:2.3(A) and (B).[1] We address each alleged rule violation in turn.

1. *Promoting confidence in the judiciary.* "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary and shall avoid impropriety and the appearance of impropriety." Iowa Code of Judicial Conduct R. 51:1.2; *see also id.* Canon 1 ("A judge shall uphold and promote the independence, integrity, and impartiality of the judiciary and shall avoid impropriety and the appearance of impropriety."). This rule requires judicial officers "to preserve the crown jewels of the judiciary— independence, integrity, and impartiality—and directs judges to uphold the fundamental qualities of judging by avoiding impropriety." *In re Krull*, 860 N.W.2d at 45 (quoting *In re Block*, 816 N.W.2d 362, 364 (Iowa 2012)). The Code defines "impartiality" to mean the "absence of bias or prejudice in favor of, or

---

[1]"The Canons state overarching principles of judicial ethics that all judges must observe. Although a judge may be disciplined only for violating a rule, the Canons provide important guidance in interpreting the rules." Iowa Code of Judicial Conduct, Scope [2].

against, particular parties or classes of parties, as well as maintenance of an open mind in considering issues that may come before a judge." Iowa Code of Judicial Conduct, Terminology. And " '[i]ntegrity' means probity, fairness, honesty, uprightness, and soundness of character." *Id.* "The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge violated this Code or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge." *Id.* r. 51:1.2 cmt. [5].

"Judges set the tone for a courtroom." *In re Russo*, 231 A.3d 563, 570 (N.J. 2020). As such, they are held to a higher standard than the average citizen, to a higher standard than an attorney—particularly when they are acting in their judicial role. *See In re Krull*, 860 N.W.2d at 45 ("Judges are held to a higher standard of conduct than attorneys because of the importance of maintaining an impartial judiciary."); *In re Inquiry Concerning Gerard*, 631 N.W.2d 271, 277 (Iowa 2001) ("[Canon 1] imposes a duty upon a judge that rises above the normal responsibilities he has as an attorney."). When judges put on the black robe and take the bench, their actions not only reflect on themselves but the entire judicial system. *See In re Inquiry Concerning Eads*, 362 N.W.2d 541, 551 (Iowa 1985) (en banc) ("The canons of conduct recognize that public confidence in the judiciary is eroded by irresponsible or improper judicial conduct.").

A judge's conduct—both his actions and his words—must reflect to the outside observer that he is presiding over proceedings in the fair and impartial manner demanded by the basic requirements of due process. *See State v. Larmond*, 244 N.W.2d 233, 235 (Iowa 1976) ("A fair trial in a fair tribunal is a basic requirement of constitutional due process. It follows a presiding judge should not only be fair and impartial, he must conduct himself in the trial to

constantly manifest those qualities." (citation omitted)). Thus, when a magistrate takes the bench or issues an order, he is not concerned only with *being* fair and impartial—he must also *appear* fair and impartial to the outside observer to protect the integrity, i.e., the reputation, of the entire judiciary. *See In re Inquiry Concerning McCormick*, 639 N.W.2d at 16 ("The focus of sanctions in judicial disciplinary proceedings is not to punish the individual judge, but to restore and maintain the dignity, honor, and impartiality of the judicial office, and to protect the public from further excesses."); *In re Inquiry Concerning Eads*, 362 N.W.2d at 551 ("The overriding purpose of the judicial disciplinary system is to provide a means for maintaining the integrity of the judicial branch of government."); *see also In re Stevens*, 645 P.2d 99, 100 (Cal. 1982) (en banc) (per curiam) (Kaus, J., concurring) (" '[J]ustice should not only be done, but should manifestly and undoubtedly be seen to be done.' The administration of justice is prejudiced by the public perception of racial bias, whether or not it is translated into the court's judgments and orders." (alteration in original) (citation omitted) (quoting *The King v. Sussex Justs.* [1924] 1 KB 256, 259 (Lord Hewart CJ))). Particularly in criminal cases, "[t]he inherent imbalance of power between a judge and a defendant mandates that defendants be treated with utmost professional courtesy," and statements from the bench that could be perceived as derogatory toward or about the defendant "contribute to the erosion of the public perception of the Judiciary." *In re Lamdin*, 948 A.2d 54, 66 (Md. 2008). The same holds true for statements made about victims of alleged crimes.

We have no trouble concluding that Magistrate Hanson violated rule 51:1.2 with respect to both complaints. As to the written order denying the request for an arrest warrant, our concern is not so much that Magistrate Hanson applied an improperly heightened standard when he treated the

purported victim (John Doe) who reported an alleged sexual assault as a confidential informant whose veracity must be tested before their reported allegations can support an arrest warrant.[2] As the State candidly stated at oral argument, the Commission did not seek to discipline Magistrate Hanson for incompetence. *See* Iowa Code of Judicial Conduct R. 51:2.5(A) ("A judge shall perform judicial and administrative duties competently and diligently."). Judges are allowed to make mistakes. Correcting errors and addressing abuses of judicial discretion are what appeals are for.

Rather, the problem with the order is that Magistrate Hanson's written explanation reflects a decision premised on stereotyped views and personal experiences, not on the facts presented in the arrest warrant application, revealing a lack of impartiality and undermining his integrity as a judicial officer. *See, e.g.*, *United States v. Collier*, 932 F.3d 1067, 1079 (8th Cir. 2019) ("An opinion [by a judge] that derives from an 'extrajudicial source' or reflects favoritism or antagonism to such a high degree that makes 'fair judgment impossible' could support a bias challenge." (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994))); *In re Disciplinary Proc. Against Gorenstein*, 434 N.W.2d

---

[2]Magistrate Hanson characterized John Doe as a "confidential informant" in the written order based on his erroneous conclusion that he needed to treat the arrest warrant application similar to a search warrant application that relied on an unnamed police confidential informant since his identity was not revealed. *See Franks v. Delaware*, 438 U.S. 154, 165 (1978) (imposing additional requirements for information provided by "an informant's tip" included in an officer's search warrant application).

John Doe was not a confidential informant. He was the alleged victim of a sexual assault who made a report with the West Union Police Department. "This court has adopted the position that information imparted by a citizen informant," which includes "a victim of a crime," "is generally reliable." *State v. Niehaus*, 452 N.W.2d 184, 189 (Iowa 1990); *see also State v. Rapenske*, 998 N.W.2d 649, 652 (Iowa Ct. App. 2023) ("When it is a citizen calling in the tip, the test for reliability is relaxed, as there is a 'rebuttable presumption that "information imparted by a citizen informant is generally reliable." ' And, when the citizen tipster is known rather than anonymous, the case for reliability of the information is even stronger because the tipster could be held accountable if the information provided turns out to be false." (quoting *State v. Walshire*, 634 N.W.2d 625, 629 (Iowa 2001))).

603, 608 (Wis. 1989) (per curiam) ("Judge Gorenstein repeatedly allowed his personal perceptions to interfere with his responsibilities as a judge. For example, he ascribed character traits to people appearing before him based on statistical and other information he had obtained from newspapers and other sources, thus denying those litigants the treatment as individuals they were entitled to receive from the court."). Specifically, his justification for denying the arrest warrant was based on his own stereotyped beliefs about how a teenage male sexual assault victim would, or should, react when assaulted by a teenage girl. He buttressed his stereotyped views with his own personal experience when he was apparently inappropriately touched as a teenager.

Magistrate Hanson also included inappropriate commentary in the written order about his views on how a "normal, hormone-ridden teenage boy" would react and the physiology of how a male's sex organ works, and unfounded assumptions about the alleged female offender based on her height and weight. These demeaning and sophomoric justifications have no place in a judicial order. *See In re Russo*, 231 A.3d at 570 ("Especially when it comes to sensitive matters like domestic violence and sexual assault, that tone [set by the judge] must be dignified, solemn, and respectful, not demeaning or sophomoric."). Magistrate Hanson fails to appreciate the effect his words have on the individuals before him seeking justice from our courts—here, the alleged victim of sexual abuse. *See In re Jenkins*, 503 N.W.2d 425, 427 (Iowa 1993) (en banc) ("The authority exercised by a judge is so great as to easily break ordinary people who are rendered comparatively helpless in their relationship with a court. Such authority should not be entrusted to those who, either deliberately or through thoughtlessness, offend the ordinary sensibilities of citizens. . . . Nowhere is it

more true than in the words chosen by a judge in a decision or decree that becomes a permanent public record.").

Equally troubling is the fact that Magistrate Hanson admitted during the Commission hearing to "ruling in anger" when he denied the arrest warrant application a few days after it was filed. We recognize that judicial officers are imperfect; we do not expect infallibility. Judges, like the parties before them, deserve a measure of grace. But this was not a situation where a judicial officer lost his temper in the heat of a moment. *See Liteky*, 510 U.S. at 555–56 ("*Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.*"). Rather, Magistrate Hanson admittedly sat on the written order for a few days. Yet, even with that time for reflection, he failed to recognize the improper reliance on stereotyped information based on his own experiences and perceptions or the inappropriate language contained in the order. In sum, Magistrate Hanson's 2022 written order reflects a failure to "promote[] public confidence in the independence, integrity, and impartiality of the judiciary," as required by Iowa Code of Judicial Conduct Rule 51:1.2.

The 2023 statement in open court to a law student prosecuting intern, referring to a Hispanic criminal defendant as a "w******" and commenting that the criminal defendant probably stole someone's identity, further reflects adversely on Magistrate Hanson's impartiality and undermines his integrity as a judicial officer. Racially derogatory remarks and stereotyped assumptions made in open court—particularly about a criminal defendant—reflect the mindset of

the judge and create in reasonable minds a perception that the judge will act based on that improper mindset. *See In re Kellam*, 503 A.2d 1308, 1311 (Me. 1986) (per curiam) ("[J]udicial accountability does not require all judges to be of precisely the same temperament or to have the same personal qualities and attitudes. A judge's style and personality does not by itself suggest misconduct. These canons, however, leave little room for judicial independence in the matter of courtroom manners. Regardless of personal style, a judge is required to show patience and dignity and to use common courtesy in daily interaction with members of [the] public. . . . Courtroom courtesy is a duty owed to the public and is evaluated . . . from the perspective of the ordinary, reasonable person." (citations omitted)).

It should go without saying that the term "w******" is a racially derogatory, highly offensive slur that does not belong in a courtroom—and especially not from the mouth of a judge. *See, e.g., Wetback, Merriam-Webster*, https://www.merriam-webster.com/dictionary/wetback [https://perma.cc/2R26-LVHH] (labeling the term as "offensive" and defining it as "used as an insulting and contemptuous term for a Mexican who enters the U.S. illegally"). We cannot overemphasize how inappropriate it was for Magistrate Hanson to use the slur—in open court—in reference to a Hispanic criminal defendant. *See In re Goodfarb*, 880 P.2d 620, 623 (Ariz. 1994) (en banc) ("The use of [racially inflammatory] language during the course of judicial proceedings is so debilitating to the administration of justice that we think the public, and the public's perception of justice, will be better served by suspending Judge Goodfarb for the balance of his remaining term."); *In re Mulroy*, 731 N.E.2d 120, 121 (N.Y. 2000) (per curiam) ("[A judge's] racially charged assessment of the case," referring to a murder victim as "some old n[*****] b[****]" in a private conversation with the prosecutor, "not

only devalued the victim's life but also cast doubt on the integrity and impartiality of the judiciary and, by itself, puts into question [the judge's] fitness to hold judicial office").

Except we must say the obvious—that the term is derogatory—because Magistrate Hanson continues to defend his use of it. He does not dispute that he said the word in open court: "I assume I did, without thinking about it." Rather than recognize the term as the racial epithet that it is, he labels it as "someone's taboo" that he "[a]pparently . . . transgressed." He cites to a 1969 opinion from our court, *State v. Holliday*, 169 N.W.2d 768, 775 (Iowa 1969) (describing a federal case involving wire interceptions by a federal communications agent and repeating what the agent overheard in that case, which included the term), to justify his use of the term in 2023 as slang, similar to "pickpocket" used in *Ette v. Linn–Mar Comm. Sch. Dist.*, 656 N.W.2d 62, 66 (Iowa 2002), or "man of the road" or "sneak thief" as used 129 years ago in *Kidd v. Ward*, 59 N.W. 279, 280 (Iowa 1894).

As with the complaint about the written order, we find that Magistrate Hanson's response to the second complaint to be as—if not more—troubling than the underlying act itself. Whether or not Magistrate Hanson recognizes his use of the slur as offensive, he most definitely violated Iowa Code of Judicial Conduct Rule 51:1.2's directive to "act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary." *See In re Inquiry Concerning Stigler*, 607 N.W.2d 699, 708 (Iowa 2000) (en banc) ("Even if Judge Stigler believed that he could be impartial (and we accept his statement that he did so believe), this impartiality could nonetheless be reasonably questioned by an impartial observer."); *see also Gonzalez v. Comm'n on Jud. Performance*, 657 P.2d 372, 382 (Cal. 1983) (en banc) (per curiam)

("[S]uch facially blatant ethnic slurs as those Judge Gonzalez uttered from the bench are apt to offend minority members not familiar with petitioner's views and may be construed by the public at large as highly demeaning to minorities."); *In re Agresta*, 476 N.E.2d 285, 286 (N.Y. 1985) (per curiam) ("Racial epithets, indefensible when uttered by a private citizen, are especially offensive when spoken by a judge. Whether or not he meant ['n***** in the woodpile'] as a racial slur, [the judge's] use of the term 'n[*****]' in any context is indefensible. That he used the term in open court with black defendants before him and in obvious reference to a particular black person makes his conduct especially egregious."). What courts recognized forty years ago should be even more obvious today.

The Commission established by a convincing preponderance of the evidence that Magistrate Hanson violated rule 51:1.2.

2. *Bias, prejudice, and harassment.* Iowa Code of Judicial Conduct Rule 51:2.3 (A) and (B) provides:

> (A) A judge shall perform the duties of judicial office, including administrative duties, without bias or prejudice.

> (B) A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice or engage in harassment, including but not limited to bias, prejudice or harassment based upon race, sex, gender, . . . national origin, [or] ethnicity . . . .

This rule is found in canon 2: "A judge shall perform the duties of judicial office impartially, competently, and diligently." *Id.* Canon 2. The comments to rule 51:2.3 provide:

> [1] A judge who manifests bias or prejudice in a proceeding impairs the fairness of the proceeding and brings the judiciary into disrepute.

> [2] Examples of manifestations of bias or prejudice include but are not limited to epithets; slurs; demeaning nicknames; negative stereotyping; attempted humor based upon stereotypes;

> threatening, intimidating, or hostile acts; suggestions of connections between race, ethnicity, or nationality and crime; insensitive statements about crimes against women; and irrelevant references to personal characteristics. Even facial expressions and body language can convey to parties and lawyers in the proceeding, jurors, the media, and others an appearance of bias or prejudice. A judge must avoid conduct that may reasonably be perceived as prejudiced or biased.

*Id.* r. 51:2.3 cmts. [1]–[2].

Again, we have no trouble concluding that Magistrate Hanson's 2022 written order and his 2023 statements in open court brought the judiciary into disrepute and violated rule 51:2.3. Magistrate Hanson's written order and the comments he made from the bench called into question his impartiality and integrity in violation of rule 51:1.2 precisely because they demonstrated biases and prejudices, which are the aim of rule 51:2.3. We agree with the Commission that his written and verbal statements included many of the examples from comment [2]. He used a "slur" when he asked the prosecuting intern if the defendant was a "w******" and he "suggest[ed] [a] connection[] between race, ethnicity, or nationality and crime" when he questioned whether the defendant had provided his real name, suggesting he had stolen someone's identity. *Id.* r. 51:2.3 cmt. [2]. His written order denying the arrest warrant relied on "negative stereotyping" about a teenage boy claiming to be the victim of a sexual assault by a teenage girl and made "irrelevant references to personal characteristics" about the defendant in surmising she was obese rather than muscular in concluding the fifteen-year-old alleged victim could have pushed her away if he really wanted to. *Id.*

The Commission established by a convincing preponderance of the evidence that Magistrate Hanson violated rule 51:2.3.

**B. Sanctions.** Determining the appropriate sanction for a judicial officer who engages in judicial misconduct is more about "restor[ing] and maintain[ing] the dignity, honor, and impartiality of the judicial office," "protect[ing] the public," and deterring other judges from similar misconduct than it is about punishing the wayward judge. *In re Krull*, 860 N.W.2d at 46 (quoting *In re Inquiring Concerning McCormick*, 639 N.W.2d at 16). We have identified a nonexhaustive list of factors to consider in reaching an appropriate sanction:

1. whether the misconduct is isolated or a pattern of misconduct;

2. the nature, extent, and frequency of the acts of misconduct;

3. whether the misconduct occurred in or out of the courtroom;

4. whether the misconduct occurred in the judge's official capacity or in his or her private life;

5. whether the judge has acknowledged or recognized the misconduct;

6. whether the judge has made an effort to change or modify his or her conduct;

7. the length of service on the bench;

8. whether there have been any prior complaints;

9. the effect of the misconduct upon the integrity of and respect for the judiciary; and

10. the extent to which the judge exploited the judicial office to satisfy personal interests.

*Id.* (quoting *In re Block*, 816 N.W.2d at 365–66).

Most of these factors serve as aggravating factors when applied to Magistrate Hanson's judicial misconduct. The Commission received the first complaint against Magistrate Hanson within six months of his appointment to the bench. When the Commission received the second complaint less than a year

later, it determined that Magistrate Hanson's conduct was not isolated, instead representing a pattern of misconduct. Both complaints involved Magistrate Hanson's official duties, one in open court and one in a written order. Magistrate Hanson does not recognize the extent of his misconduct, and he has made no real effort to modify his behavior. It has been nearly a year since he was first notified of the investigation by the Commission, and he is still only willing to participate in anger management or bias training if we direct him to do so.

Not only did Magistrate Hanson not consider his conduct and statements inappropriate when they were made, but he defended them throughout the Commission's investigation, even up to the time of oral argument before our court. He has not shown regret for his choice of words. He has not shown genuine remorse for the effect his statements likely had on the litigants. He has shown no aptitude for self-improvement. Indeed, he suggested in his brief that the Commission simply provide him with a list of "bad words" so that he can avoid them in conversation.

Most concerning, though, is Magistrate Hanson's lack of self-awareness and his apparent inability for self-reflection as revealed in his responsive brief filed with our court. *See In re Jenkins*, 503 N.W.2d at 426 (imposing greater sanction for judge's "inappropriate and unnecessary characterizations of persons appearing before him" where "by his answer and explanation at the hearing, he has failed to appreciate or understand that his conduct was offensive or violated the canons"); *see also In re Goodfarb*, 880 P.2d at 621 (noting that "[t]he Commission . . . found Judge Goodfarb's failure to recognize the full extent of the harm caused to the public's perception of the judiciary to be aggravating" while finding as mitigating that the judge "had begun counseling to deal with his intemperate use of language"); *In re Fiffie*, 395 So. 3d 738, 750 (La. 2024) ("In

mitigation we recognize Judge Fiffie's relative inexperience as a judge and his stated desire to do what he believes is right. However, his persistent refusal to acknowledge his errors, to take unqualified responsibility for them, and to listen to the advice and counsel of others is troubling."); *cf. In re Inquiry Concerning Sevcik*, 877 N.W.2d at 711 (noting the Commission's reliance on Magistrate Sevcik's "candidness" and "his admission" of inappropriate behavior in its recommended sanction); *In re Block*, 816 N.W.2d at 364 ("Judge Block testified at the Commission hearing. He was contrite and honest, accepted responsibility for his actions, and acknowledged his conduct gave the judiciary a 'black eye.' "); *In re Inquiry Concerning McCormick*, 639 N.W.2d at 17 ("Judge McCormick was profusely apologetic, and recognized the harm he caused."). In his brief to our court, Magistrate Hanson defended his order denying the arrest warrant request by asserting that he "smelled lies" in the alleged victim's allegations. Magistrate Hanson is absolutely correct that he has an obligation not to rubber-stamp any warrant application presented to him. Rather, he is expected to exercise his judicial discretion, which often includes assessing an affiant's credibility. But what he cannot seem to comprehend is that our rules requiring impartiality and integrity demand that he exercise his judicial discretion based only on the facts before him, not his own personal code of honor and personal biases.

In his brief, Magistrate Hanson explained his view of sexual assault allegations:

> *All judges should know, and fear, false accusations of sexual crimes alleged long after the supposed events.* I witnessed the televised atrocities visited upon U.S. Supreme [Court] Justice nominees . . . by women, whom effective cross examinations showed to be, telling falsehoods. I will never abet such "high tech lynchings."

(Emphasis added.)

Magistrate Hanson's statements in 2022 and 2023 and this year before our court are not those of an independent, impartial arbiter carefully considering whether the allegations provided in the affidavit before him supplied probable cause to support an arrest warrant. Instead, they reflect the biases of someone with preconceived and inflexible notions about alleged sexual assault victims. *See* Tyler J. Buller, *Fighting Rape Culture with Noncorroboration Instructions*, 53 Tulsa L. Rev. 1, 2 (2017) [hereinafter Buller] ("The English legal system was infected with what we now call 'rape myths'—misogynist falsehoods about sexual assault—that eventually made their way across the Atlantic."); *cf. State v. Sievers*, ___ N.W.3d ___, ___, 2025 WL 938109, at *10 (Iowa Mar. 28, 2025) (Waterman, J., dissenting) (discussing application of Iowa's "outcry statute" that allows hearsay testimony about a child sexual abuse victim's "initial disclosure" of the abuse to another person and explaining that "[t]he legislature enacted section 622.31B to . . . dispel the inference that the delay in reporting the crime to authorities casts doubt on whether it happened"). As now-Judge Buller noted in his law review article, although many of the formal legal barriers to prosecuting sexual assault crimes, "including the corroboration requirement," have been eliminated, "the implicit effects of institutionalized sexism and anti-victim bias persist in the hearts and minds of jurors." Buller, 53 Tulsa L. Rev. at 2. Magistrate Hanson's statements in these proceedings reflect that those biases persist with him as well.

We find a recent judicial disciplinary proceeding from New Jersey instructive. The New Jersey Supreme Court removed a judge from office based on four acts of misconduct, the most serious of which involved an unrepresented litigant who obtained a temporary restraining order (TRO) against the father of her five-year-old daughter after he allegedly forced her to have sex against her

will. *In re Russo*, 231 A.3d at 567–68. At the hearing on the final restraining order (FRO), the judge took over questioning the complaining witness during the defendant's cross-examination, asking her several very pointed and "coarse questions" about her efforts to stop the alleged assault. *Id.* at 568–69. The judge ultimately dismissed the TRO and declined to enter an FRO based on his conclusion that the petitioner was not credible in light of her responses to his questions. *Id.* at 569. The New Jersey Supreme Court concluded that the judge's explanation to the judicial qualifications panel that "he was trying to help a 'demoralized' witness on cross-examination" was not only contrary to the record but that the questioning was also irrelevant to the issue of whether a sexual assault occurred. *Id.* at 568–69. In explaining its decision to remove the judge from office, the court reflected:

> It is inconceivable that [the judge] could sit in judgment in domestic violence or sexual assault matters in the future. No reasonable victim could have confidence in a court system were he to preside over those kinds of cases again. Nor could any objective, informed member of the public.

*Id.* at 574–75.

We find the same to be the case here. Magistrate Hanson has an obligation as a judicial officer to address each case before him with impartiality and based only on the facts before him. If a judicial officer concludes that the information provided in a warrant application is insufficient to establish probable cause or is not credible, he should absolutely deny the application unless the affiant provides more information. But Magistrate Hanson's insistence that his role is to ferret out false accusations of sexual assault by requiring corroboration is not only contrary to the law, *see, e.g.*, *State v. Kraai*, 969 N.W.2d 487, 491 (Iowa 2022) (noting that it has been the law in Iowa since 1974 that a conviction for rape can be supported solely by the victim's testimony, without a need for

corroboration), it is also contrary to his oath as a judge to set aside any preconceived biases, *see* Iowa Code § 63.6 ("All judges of courts of record shall qualify before taking office following appointment by taking and subscribing an oath to the effect . . . that, without fear, favor, affection, or hope of reward, they will, to the best of their knowledge and ability, administer justice according to the law, equally to the rich and the poor."). And his refusal to take any accountability for that fact makes him unable to preside over any proceeding involving a sexual assault.

Magistrate Hanson's inability to recognize the derogatory effect of his choice of words also raises serious concerns about his ability to impartially preside over a case involving minorities, particularly those charged as a criminal defendant. That he believes this matter can be put behind him if we provide a list of "bad words" he should avoid reveals how deep his lack of understanding goes.

Finally, we note that Magistrate Hanson has an obligation to govern not only his own conduct, but also the conduct of his staff and the lawyers in the proceedings before him. *See* Iowa Code of Judicial Conduct R. 51:2.3(B) ("A judge shall not . . . by words or conduct manifest bias or prejudice or engage in harassment . . . and shall not permit court staff, court officials, or others subject to the judge's direction and control to do so."), (C) ("A judge shall require lawyers in proceedings before the court to refrain from manifesting bias or prejudice or engaging in harassment . . . ."). If Magistrate Hanson cannot recognize bias or prejudice in his own conduct, we cannot trust him to recognize it in those he is tasked with policing.

Upon careful consideration, we conclude that Magistrate Hanson "is simply and unalterably unsuited to be a judge, and no attempts at behavior

modification are going to change that significantly. [H]e simply should not be a judge." *In re Inquiry Concerning Holien*, 612 N.W.2d 789, 798 (Iowa 2000) (en banc); *see also In re Goodfarb*, 880 P.2d at 623 (suspending judge for the remainder of his term despite the commission's recommendation for a three-month suspension based on two counts of misconduct for using racially inflammatory language in connection with a hearing in one criminal case and profane language in another); *In re Ademiluyi*, 321 A.3d 142, 201 (Md. 2024) (concluding that removal was required "[g]iven the wide-ranging and pervasive nature of [the judge's] misconduct, her inability to comply with the fundamental requirement that she perform the duties of office fairly and impartially, and her lack of remorse for blatant and egregious violations of the [Maryland Code of Judicial Conduct]"); *In re Russo*, 231 A.3d at 575 (removing judge from office because "[t]he series of ethical failures that [the judge] committed are not errors of law, innocent missteps, or isolated words taken out of context," but "are flagrant and serious acts of misconduct"); *In re Mulroy*, 731 N.E.2d at 123 (removing judge from office based on pattern of misconduct, including engaging in racial epithets and ethnic slurs and intemperate behavior); *In re Disciplinary Proc. Against Gorenstein*, 434 N.W.2d at 608–09 (suspending judge for two years based on lack of necessary judicial temperament evidenced by a pattern of expressing insensitivity and disrespect toward litigants, witnesses, and other courts in the judicial system).

### III. Disposition.

We order the respondent, David J. Hanson, removed from office effective ten days from the filing of this opinion unless the respondent has, in the meantime, resigned his position. In the event he has resigned in that time, the

Iowa State Court Administrator must certify that fact to this court, and a supplemental order will be filed accordingly.

**Application Granted; Judicial Officer Removed.**